## Jones v. Commonwealth.

(Decided May 13, 1921.)

### Appeal from Whitley Circuit Court.

1. Criminal Law—Threats— Evidence.— Uncommunicated threats, made either by the defendant or the one against whom he committed his offense, and vice versa, if not too remote, are relevant upon the trial of defendant where the evidence is conflicting, for the purpose of showing ill feeling and to illustrate the fact of who began the difficulty and who was to blame therefor as well as for its results; but, indefinite threats so far removed from the time of the difficulty as to not possibly be a part of it and in which no reference is made to the other antagonist are not admissible for any purpose.

2. Criminal Law—Trial—Misconduct.—Attorneys are officers of the court and constitute a part of the machinery for the administration of justice and they have no more right to engage in conduct during a trial for the purpose of creating a false impression upon the jury than has the presiding judge, and wherever such forbidden conduct is indulged in and is of such a nature as was calculated to influence the jury in its verdict a new trial should be granted, unless from the whole record the court is convinced that no injustice has been done.

3. Criminal Law—Trial—Misconduct—Evidence.—It is inexcusable conduct on the part of counsel employed to prosecute to offer to introduce evidence against defendant which he is convinced is incompetent, but which he offers for the purpose of getting it before the jury and for the damaging effect it might have against the defendant. The same may be said as to the conduct of counsel in asking a question, ostensibly for the purpose of laying the foundation to impeach or contradict a witness with no intention of introducing the contradicting witness, but only for the purpose

of getting the damaging statement before the jury and for the influence it might have with that body.

4.   Criminal Law—New Trial.—While one error, standing alone, may not be sufficiently prejudicial to authorize the granting of a new trial or the reversal of a judgment; but when there exists a number of them and defendant's guilt it not indisputably proven, and upon the whole case the court is convinced that defendant has not had a fair or impartial trial, a new trial should be granted (subsection 7, section 271, Criminal Code) and this court upon appeal will reverse the judgment denying it, under such circumstances, under the authority conferred upon it by section 340 of the Criminal Code.

STEPHENS & STEELY and TYE & SILER for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Upon his trial under an indictment for voluntary manslaughter wherein he was accused of killing Dewey Smith, the appellant Russ Jones was convicted and his punishment fixed at a term of five years' confinement in the penitentiary, upon which judgment was pronounced. Defendant's motion for a new trial, which contained about fifteen reasons why it should be granted, was overruled and he prosecutes this appeal. Many of the specified reasons in the motion are extremely technical and, we think, wholly immaterial, and in the course of this opinion we shall refer to and consider only those which we deem worthy of notice.

The facts of the case are comparatively short and there exists but little, if any, material contradiction in the testimony of the witnesses. The killing occurred between 9 and 10 o'clock on the night of October 2, 1920, on a public road in Whitley county. There was a bright moonlight, but the place of the killing was in the shadow of a tree, thus preventing some of the witnesses, except those immediately present at the place of the shooting, from seeing exactly what occurred. Hence, the only witnesses who saw or pretended to testify as to what happened at the time of the shooting were the defendant and Grace Worley, a young lady between 15 and 16 years of age. There had been a box or pie party at Thomps White's school house in the earlier part of the evening, but it was over with by about 9 o'clock, and the attendants started for their respective homes. Defendant and one or two others went to that party, travelling horse-

back or muleback and accompanied by no lady companion and the same was true as to the deceased, Dewey Smith. Miss Worley and another young lady went to the party unaccompanied by any gentlemen and they rode the horse of the father of the former. When the party broke up and the people started home, the latter rode behind defendant on the animal he was riding, while her companion rode behind another young gentleman who had gone to the party with defendant, and another young man rode the horse that was ridden by Miss Worley in going to the party. A short distance from the school house the deceased passed defendant and Miss Worley and he and others stopped in front of the barn of Doc Smith, who was the father of deceased, and were engaged in a discussion as to whether they would make up a dance to be held at a neighbor's house to furnish entertainment for a portion of the rest of the night. This discussion was going on when defendant and Miss Worley and the other couple accompanying them overtook the crowd in front of the barn, and during the conversation deceased asked Miss Worley if she would attend the dance if it was gotten up, when she answered in substance that she had promised her father to come home direct from the box party and that she felt like she could not attend the contemplated dance; and some of the witnesses say that she stated in that connection that she had always gone with him anywhere he wanted her to. After a little while she got upon the horse that she had ridden to the party and in company with defendant started down the road in the direction of their homes with others following them a short distance behind. In some 10 or 15 minutes the deceased and his crowd concluded to get up the dance and he started in a gallop down the road in the direction travelled by Miss Worley and defendant, and what occurred when he overtook them is thus told by her: "He came on down the road and galloped in between us and caught hold of my horse's bridle and said to wait and we stopped and Dewey said to me that Aswald Dail told him to bring me back to the crowd where we left them and I told him I couldn't go back and Jones said 'what do you think you are celebrating,' and he said 'God damn you, I don't think I am celebrating a damn thing.' Jones said 'I didn't aim to make you mad,' and Dewey said 'shut your mouth you s— of a b—, or I will kill you,' and Jones said 'You will kill the best friend you have got when you do that,' and

Dewey cursed Jones two or three times and told him twice again he would shoot him and Jones said to me to let's go and Dewey said, 'No, by God, you will not go, you God damned hairy necked s— of a b—, I will shoot you.' " Some of the witnesses say that the deceased, when he asked Miss Worley if she would attend the dance and upon her answer that she could not because she had promised her father to return home, said, "We will attend to your damned father," and that when she and defendant started away deceased said, "Take him and go to h—l with him, God damn him." Following the above testimony the witness stated that at the time of the shooting deceased had his back to her and that she could not see what was going on in front of him but she saw his elbow raised and his right hand lifted, but could not see what he was doing with it. The testimony of the defendant as to what occurred just before he and Miss Worley left the crowd in front of the barn and as to what happened at the time of the killing, as shown by the record, is that when he and Miss Worley overtook the crowd in front of the Smith barn deceased said to her, "Where in the hell are you going?" and his testimony continued: "She said 'I am started home,' and he said 'By God, you are going to the dance,' and she said 'No, my father is at home and said for me to bring this mare back,' and he said 'God damn your father we will get by him all right,' and she got on her mare and rode up to me and said to let's go and when we started off and got out about 10 steps he said 'Go to hell, God damn both of you.' And we rode on and got down the road between Nattie Smith's and Aunt Emily Steely's place and he came on and overtook us and ran between our horses and grabbed my mule by the bridle and turned his mule loose and grabbed her horse's bridle and I said 'What do you think you are celebrating,' and he said 'You thought you were running away with me,' and I said that I wasn't, that I didn't think that and he said I needn't tell no God damned lie and said he would kill me and I said 'You will kill the best friend you have,' and he said 'God damn you, I will kill you,' and she said 'Dewey, I never saw you do this way before in my life,' he was cursing her and in a few minutes I said to her to let's go and he said 'God damn you, Grace, you are not going for Aswold Dail said to bring you back, and I will kill you, you God damned hairy necked s— of a b—'

and I shot him." He subsequently stated that deceased ran his right hand in his bosom as if to draw a weapon and that he thought deceased was going to shoot him or inflict upon him great bodily harm and that he shot deceased in what he believed was his necessary self-defense. The testimony of these two witnesses is not materially contradicted by any other witnesses although it is shown that the deceased, who was shot in the head and fell dead in the road, had no pistol though he had a knife in the pocket of his pantaloons. It appears from the testimony that deceased had been paying attentions to Miss Worley for something like three years while defendant had been in her company only two or three times before the fatal occasion.

One of the grounds urged for a new trial is misconduct of counsel, hired to assist the prosecution, which misconduct consisted in asking Miss Worley, on cross-examination, highly improper questions and in introducing as a witness in behalf of the Commonwealth Jack Stephens. One of the questions asked Miss Worley, about which complaint is made, is this one: "Did you not go to the grave of the deceased one time and there state in the presence of Mary Smith, Nellie Huddleston, Dora Smith and Jesse Huddleston and say this in words or substance—'Poor Dewey, I didn't tell the truth about how it took place or how come him to be killed by Jones but when it comes time I will tell the truth about it?'" She answered that she made no such statement. Other questions purporting to lay the foundation for impeaching the witness were also asked with like answers. These supposed impeaching witnesses who were named in the question were present at the trial and none of them were introduced or offered to be introduced to prove the impeaching statement and the record is silent as to the reason, if any, why they were not introduced. If counsel was deceived by them as to what they would testify he made no effort to manifest that fact by anything appearing in the record. This furnishes grounds for the suspicion that the purpose of the question was to damage the credibility of Miss Worley and to weaken her testimony in the minds of the jury by means of this wholly unwarranted "smoke screen," under the belief that they would conclude that "Where there was smoke there must be some fire." If such was the purpose of counsel his conduct was, to mildly put it, most highly improper, a fact,

which we believe will be universally admitted.  The chief purpose in the conduct of trials is, or should be, to see that justice, as near as may be, shall prevail.  This can never be accomplished by the injection of misleading matters into the record, either directly or indirectly; for the temple of justice has for its sole foundation, and is built upon truth, and it is upon this alone that all the law of the country both civil and criminal is erected.  Attorneys are officers of the court and constitute as much a part of its machinery for administering right and justice in the conduct of trials as does his Honor upon the bench, and it would certainly be an unheard of proceeding for the latter to engage in an effort to create a false impression upon the minds of that part of the judicial machinery whose duty it is to pass upon the facts.  Cases are not wanting where similar conduct of counsel has been held prejudicial, even to the extent of authorizing a reversal of the judgment.  L. & N. R. R. Co. v. Payne, 133 Ky. 539; Shields, Admr. v. Rowland, 151 Ky. 136, and Baker v. Commonwealth, 184 Ky. 207.

The witness Stephens said that he was at a school fair some two months before the killing and while there he met defendant whom he scarcely knew and with whom he had never conversed before, and that defendant took the witness to one side when this occurred: "He said he didn't know how mean he was and never would know until he killed some d— s— of a b—; said he was going to kill the first one that fooled with him and if he couldn't get him to fool with him he would kill him one anyhow." The testimony was objected to, but the objection was overruled and it was admitted. At the close of all the evidence, however, the court withdrew the testimony of that witness from the jury and directed them not to consider it.  That the alleged indefinite and remote threat testified to by that witness was incompetent there can be no question. 21 Cyc. 922; Johnson v. Commonwealth, 9 Bush 224; Hollingsworth v. Warnock, 112 Ky. 96; Whitaker v. Commonwealth, 13 Ky. L. R. 504; Commonwealth v. Hoskins, 18 Ky. L. R. 59, and Cardwell v. Commonwealth, 20 Ky. L. R. 496.  Since, however, this testimony was withdrawn from the jury before the case was submitted to it, under the doctrine announced in the recent case of Welch v. Commonwealth, 189 Ky. 519, and cases referred to therein, the error in its introduction was no doubt cured and a reversal would not be ordered therefor; but

it appears in this case, from a preponderance of the evidence heard, that the same employed prosecuting counsel, contrary to the suggestion of the Commonwealth's attorney, insisted upon the introduction of this testimony and stated that he thought it was incompetent but if he could get it before the jury it would have its effect, notwithstanding it might afterwards be withdrawn. And it is of this conduct on the part of the attorney that the chief complaint concerning this testimony is made. Our opinion concerning this is fully expressed above and we will not attempt to enlarge upon it.

One of the grounds for a new trial was newly discovered evidence since the trial of which the defendant had no knowledge, nor could have discovered it by ordinary care before the trial. In support of that ground he filed the affidavits of William Goins and John Goins. William Goins stated in his affidavit that about the last of July, 1920, he had a conversation with deceased, Dewey Smith, in which he said that "If he (Smith) ever caught Jones (defendant) with his girl across the river, he would fix him, that it would do him good to kill him." John Goins stated in his affidavit that upon another occasion he met the deceased in Williamsburg where deceased said to him: "That Russ Jones had been going with his girl, that she had been attending meeting over at the place and asked me if I had ever heard Russ Jones say anything about him. Affiant told him that he had not and he then said that if he ever caught him with his girl again that he would use this on him, showing him (affiant) a pistol which he (deceased) had in his front pants' pocket." It is shown that these witnesses never communicated those threats to defendant or his attorneys and he knew nothing of them until after the trial. That they were relevant and pertinent under the facts of this record there can be no doubt. In the case of Newton v. Commonwealth, 31 Ky. L. R. 327, similar uncommunicated threats made by the deceased are declared to be admissible, the court saying: "Threats, though uncommunicated, may be admitted to prove the ill feeling of the person making them toward the person threatened, or, where the matter is in issue, to show who began a conflict resulting in homicide. (Miller v. Commonwealth, 10 Ky. L. R. 672, 89 Ky. 653; Wheeler v. Commonwealth, 27 Ky. L. R. 1090, 120 Ky. 697)." See also Marshall v. Glover, 190 Ky. 113.

It furthermore appears that after the case had been submitted and the jury had been placed in the hands of the sheriff to be kept together until a verdict was rendered, W. T. Smith, a cousin of the deceased, and who took an active part in the prosecution, mixed with the members, while the jury was upon the sidewalk and the sheriff was in the streets, and created some commotion and was talking to some of them and patted some of them upon the shoulder. It is not shown that he said anything to any of them concerning the trial. It may be that this relative of the deceased had no ulterior motive in his conduct, but to say the least of it, it cannot be said that in conversing and in coming in contact with the jury at that time his actions were void of criticism. He certainly had an opportunity to whisper a word or to create the impression with some member of the jury that he desired the conviction of the defendant. His conduct created strong grounds for suspicion and the Commonwealth did not successfully explain it away. Defendant knew nothing of the above matter till after the verdict. Our criticism of this conduct is based upon the same grounds hereinbefore expressed concerning the conduct of counsel in the trial of the case. Defendant in this case may be guilty, *i. e.*, he may have shot the deceased without justifiable excuse, but whether so or not he is entitled to a fair and impartial trial of that issue. The Commonwealth does not desire, nor does the law permit it, through either elected or employed counsel, to persecute the accused, but only to prosecute him. While, possibly, none of the errors hereinbefore recited, standing alone, would be sufficient to authorize a reversal of the judgment of conviction if defendant's guilt was clearly proven, we have often held that a number of them, each of which approaches close to the line of being sufficiently prejudicial, will combined authorize a reversal, unless guilt is convincingly established. Sub-section 7 of section 271 of the Criminal Code authorizes the granting of a new trial if "From any other cause, the court be of opinion that the defendant has not received a fair and impartial trial;" while section 340 of the same code authorizes this court to reverse a judgment of conviction when "upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby."

Considering the errors referred to, altogether, we have concluded that the defendant has not had a fair and

impartial trial within the intent and purpose of the law and because thereof the judgment is reversed with directions to grant a new trial and for proceedings consistent with this opinion.