# �export �export.

# Richmond.

## E. S. Barnard v. Commonwealth.

November 16, 1922.

1. Exceptions, Bill of—*Record—Identification of Evidence and Instructions.*—The better practice is for the trial judge so to identify the evidence and the instructions to which the bills relate as to make it impossible to question such identification.

2. Exceptions, Bill of—*Record—Identification of Evidence and Instructions—Case at Bar.*—In the instant case the evidence was stated by the trial judge to be "here filed and identified by the stamp thereon, 'Archie P. Johnson, shorthand reporter, Christiansburg, Virginia,' which the court here certifies as all of the evidence that was taken in the case, and certifies the said stenographic report as a part of the record for the trial of this case."

   *Held:* That this sufficiently identified the evidence and made it a part of the record.

3. Exceptions, Bill of—*Record—Identification of Evidence and Instructions—Case at Bar.*—In the instant case the instructions given and refused were identified, some by numbers and some by letters. While it did not affirmatively appear that these identifying numbers and letters were made thereon by the judge, it is fair to assume that they were made either by him or by his direction.

   *Held:* That the identification was sufficient, but such method of identifying the instructions is worthy of criticism, and the practice should be discouraged.

4. Exceptions, Bill of—*Record—Identification of Instructions.*—Trial judges should by some unmistakable mark of their own so clearly identify instructions which are intended to be embodied in the record as to conclude the parties, and to give the clerk an unerring guide when making up the transcript. There should be neither any question nor any ground for raising a question as to what constitutes the record when the case reaches the Supreme Court of Appeals.

5. Homicide—*Res Gestae—Statements of Deceased held not to Form Part of the Res Gestae, and their Admission to Constitute Reversible Error.*—In a prosecution for homicide the sister of deceased was allowed to testify as to statements of deceased after the shooting. She testified that deceased said, "Mamma, she was right in bed with him" (meaning that the wife of deceased was in bed with the accused) and

"Mamma, who would have thought any one would have shot me," and her mother testified to the same effect. The witnesses estimated that these statements of accused were made within half a minute after the last shot, but from evidence as to the mother's movements between the time of the last shot and the statements in . question, it appeared that these estimates were not very reliable.

*Held:* That, whether the statements were made half a minute, or more or less, after the last shot, it is apparent that they were the mere recital of a past occurrence, and could not be considered as part of the *res gestae,* and under the circumstances, the admission of the testimony was highly prejudicial to the accused, and entitled him to a reversal.

6. HOMICIDE—*Evidence—Declarations of Deceased.*—In a prosecution for homicide, statements of deceased to the effect that his wife was right in bed with accused, and "who would have thought any one would have shot me," while they might have been admissible if the deceased had shot the accused, as showing the state of his own mind and the facts as they appeared to him, in order to determine the degree of his responsibility, are inadmissible against accused, as the state of mind of deceased and the matter as it appeared to him has little, if any, relation to the rights of the accused, who could not be either convicted or prejudiced because of the state of mind of the deceased. As to the accused, the statements were hearsay.

7. HOMICIDE—*Evidence—Cross-Examination—Attempts to Show Improper Intimacy between Accused and the Wife of Deceased.*—On a prosecution for homicide, the only evidence in the case tending to show any improper relations between the accused and the wife of deceased was that the wife of deceased was at or inside the door of the bedchamber occupied by the accused. The wife testified that she went to the room of accused to get something she had placed in the room during the day. The attorneys for the prosecution undertook, by insinuating questions to the accused and to the wife of deceased, to show undue and improper intimacy, as by the writing and receiving of a note and being confronted therewith by a sister of the deceased. All of this was categorically denied by the witnesses, and no effort was thereafter made to establish the facts insinuated.

*Held:* That while the liberties of a cross-examiner are very great, they do not extend far enough to justify such a practice.

8. HOMICIDE—*Instruction Denying Self-Defense—Conflicting Instructions— Reversible Error.*—In a prosecution for homicide, the court instructed the jury that if the accused "allowed the wife of the deceased to get in his bed or allowed her to enter into acts leading in the mind of a reasonable man to a commission of the wrongful act of illegal intercourse with the wife of the deceased, and had in contemplation that the deceased, the husband, would or might interfere or would or might make an assault upon the accused because of great passion

aroused by such act on the part of the accused, and the accused armed himself with a deadly weapon with intent to take the life of the deceased or do him some serious bodily harm should it become necessary to save his own life in the course of such interference or of such attack; that accused under such circumstances did take the life of the deceased in pursuance of such intent—then such killing is willful, deliberate, and premeditated killing, and is murder in the first degree." There was no evidence that accused allowed the wife of deceased to get in his bed, or that accused armed himself with a deadly weapon with the intent to take the life of deceased.

*Held:* That the instruction, based upon these erroneous views of the evidence, absolutely denied the accused the right of self-defense, and was, moreover, in conflict with another instruction, which told the jury, under substantially similar conditions, that accused had the right to defend himself.

9. HOMICIDE—*Self-Defense—Right of Paramour to Defend Himself.*—In the instant case the fault, if any, of the wife, however grave it may have been, was past. She had been taken to her own room by her husband, and the accused was resting quietly in his own chamber. If, under these circumstances, the husband undertook to take the law in his own hands and attack accused, the accused clearly had the right to defend himself.

Error to a judgment of the Circuit Court of Floyd county.

*Reversed.*

The opinion states the case.

*J. E. Proffit, Lawson Worrell,* and *Hoge & Darnall,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

E. S. Barnard was indicted for the murder of Dr. Herman Poff, and upon his trial was convicted of murder in the second degree.

[1] It is insisted for the Commonwealth that the judgment must be affirmed because there are no proper bills of exception. These bills are subject to criticism, for unquestionably the better practice is for the trial judge so to identify the evidence and the instructions to which the bills relate as to make it impossible to question such identification.

[2] In this case the evidence is stated by the trial judge to be "here filed and identified by the stamp thereon, 'Archie P. Johnson, shorthand reporter, Christiansburg, Virginia,' which the court here certifies as all of the evidence that was taken in the case, and certifies the said stenographic report as a part of the record for the trial of this case." This identification is certainly as complete as that which was held sufficient in the case of *Norfolk & Western Ry. Co.* v. *Rhodes*, 109 Va. 176, 63 S. E. 445, in which it is held that "A bill of exception which after certifying that the plaintiff and defendant each introduced evidence says, 'all of which evidence both for the plaintiff and defendant is found in a typewritten booklet marked "A" and is adopted by the court as the evidence introduced by the plaintiff and defendant,' and that it contains all the evidence offered by them, sufficiently identifies the evidence and makes it a part of the record of the case."

[3, 4] The instructions given and refused are identified, some by numbers, and some by letters. While it does not affirmatively appear that these identifying numbers and letters were made thereon by the judge, we think it fair for us to assume that they were made either by him or by his direction. While such method of identifying instructions is worthy of criticism, because it might lead to serious controversies as to the true record in a particular case, we are of the opinion that here the identification is sufficient. Such a prac-

tice, however, must be discouraged, and trial judges should, by some unmistakable mark of their own, so clearly identify instructions which are intended to be embodied in the record as to conclude the parties, and to give the clerk an unerring guide when making up the transcript. There should be neither any question nor any ground for raising a question as to what constitutes the record when the case reaches this court. *Ratcliffe* v. *McDonald's Adm'r*, 123 Va. 788, 97 S. E. 307.

The petitioner assigns numerous errors. We shall neither discuss nor refer to several of them. This because where not waived by the petitioner the errors, if existent, are not likely to be repeated on another trial and are not sufficient in our judgment to justify a reversal.

There are, however, several errors assigned which are serious in character and require consideration. To comprehend their force it is necessary to make a general statement of the issues involved. We will not undertake to include therein every fact disclosed by the record, but only those which are deemed necessary for the consideration of the legal questions involved.

The admissible evidence which tends to support the conviction may be thus stated: The deceased came to his father's home at Check, in Floyd county, where he was expected, on the night of August 6, 1921, to see his wife and three children, who were concluding a ten day visit there, intending to take them, with a servant, back to his own home by automobile the next morning. The accused, who had recently moved to that village, operated a store there but had not yet brought his wife and child, who were then at Salem, Va., at her father's home. He boarded with and had his room in the house of J. J. Poff, the father of the deceased. The automo-

bile in which the deceased undertook the journey became stalled on the way, and he with a friend rode to his father's home on two mules. His sister, Miss Iva Poff, testified that she was aroused and alarmed by a pistol shot in the hall of the dwelling; that she went there quickly and found her brother, the deceased, at the door of his wife's room, she being in the room, he with a pistol advancing on his wife, and as she (witness) believed about to shoot her; that she got between them and pushed him to the end of the passageway to the door of a porch, at one end of which was her room and at the other the room occupied by the accused; that at or about the time she got her brother outside of this door and on the porch a shot was fired, apparently from a closed room, followed quickly by other shots; that the deceased reeled and commenced firing his pistol into the room. After the shooting the deceased was found lying on the porch with a fatal wound, of which he died the next day. The bullet which killed him entered his face below the ear at the hinge of the cheek bone and ranged backward through the brain; and he also had a broken leg caused by another shot.

On the contrary, the evidence which tends to show that the accused shot in self-defense may be thus stated: After he had retired for the night, the wife of the deceased came to the door of his chamber in her night clothes and knocked. In response to his inquiry she said she came for a bottle containing a liquid used for shampooing, which she said she had placed on his bureau during the day, the bureau being near an open window, and the bottle being placed there as she explained, in order to keep it out of the reach of her children, of whom she had three. She had been sitting on the porch washing her baby's head, and had gone off and forgotten the bottle and brush. She, as well

as all of the other inmates of the household, expected
the deceased momentarily, and while waiting she de-
termined to wash her own hair, and pursuant to this
purpose went to the door of the accused, as stated.
Just about this time, the deceased, who his wife testi-
fied was intoxicated, came to the door and took her
away to their own room. He had a pistol in his hand,
and an altercation followed, during which she was try-
ing to explain to him the innocence of her purpose.
During this altercation he fired his pistol in the.pas-
sage, with what purpose does not appear. She con-
tinued to attempt to reason with him, but he returned
to the door of the room of the accused, having previ-
ously said, "Where is the d—— son of a b——? I am
going to kill him," and this language the accused also
heard coming from the deceased. The accused testi-
fied that when he heard this language was the first
time he had any thought that the deceased had any
enmity against him; that after hearing it he got up
out of his bed and went to the bureau drawer and got
a pistol; that the deceased pushed the door of his room
open and began shooting at him. One of the bullets
struck the mattress upon which the accused had just
previously been lying, and two other shots were fired
at him and into the room by the deceased. That until
the deceased.pushed the door open and commenced
firing at him, the accused did not fire, but after this he
fired two shots at the deceased, one of which killed him.

[5-7] After these occurrences and while the mother
and sister of the deceased were attempting to care for
him, Iva Poff, a sister of the deceased and a witness
for the Commonwealth, was asked and permitted, over
the objection and exception of the accused, to testify
thus:

"Q. Did you hear what Dr. Herman Poff told his
mother when she got there?

"A. I did.

"Q. State to the jury exactly the words as near as you can, what your brother said to your mother when she got there.

"A. He said, 'Mamma, she was right in bed with him.' "

The mother of deceased likewise testified on the same subject thus:

"Q. What did he say to you, if anything?

"A. 'Mamma, who would have thought anyone would have shot me.' The next thing he said, 'Mamma, she was right in bed with him.' "

This testimony is also made the subject of a bill of exceptions. The trial court admitted it upon the ground that the statement of the deceased was made within half a minute after the last shot, and held it to be a part of the *res gestae.* The witnesses estimated the time to be as certified—that is, at about half a minute after the last shot. The facts are that the mother had retired and was in her chamber downstairs when the first call for her came from upstairs. She did not realize the seriousness of the situation, and said that she did not respond immediately because she was undressed. She went to the telephone to call another son who lived not very far away, but was unable to get any response. She then went out into the yard and called aloud for this son and thus made him understand that his presence was needed, and thereafter she returned to the house and went upstairs. These facts must be considered in determining the length of time which elapsed between the last shot and the statements of the deceased in question as well as the unreliable estimate of half a minute which the witnesses made. Whether it was half a minute, or more or less, it is apparent to us that the statements referred to are the

mere recital of a past occurrence and cannot be considered as part of the *res gestae*.   It is not claimed to be admissible as a dying declaration, and cannot be held to be admissible on this or upon any other ground. If the deceased had shot the accused, and the degree of his crime were in issue, then such a statement showing the state of his own mind and the facts as they appeared to him, in order to determine the degree of his responsibility, would doubtless have been admissible. It must be borne in mind, however, that while the state of mind of the deceased and the matter as it appeared to him would be most pertinent if he were on trial, it has little if any relation to the rights of the accused, who cannot be either convicted or prejudiced because of the state of mind of the deceased.   As to the accused, the statement is hearsay and inadmissible.   Except the fact that the wife of the deceased was at or inside the door of the bed chamber occupied by the accused and the inferences to be drawn from this circumstance, this inadmissible statement of the deceased is the only evidence in the case tending to show any improper relations between the accused and the wife of the deceased. In this connection it is noted that the tragedy occurred on the night of August 6th, when the weather was mild, when many doors and windows were open.   The porch referred to faced the public road and was in full view thereof.   The dwelling was occupied by several other adults.   The woman whose character is involved had the care of three children.   The room at the other end of the porch from that occupied by the deceased and the adjacent one were occupied by two sisters of the deceased, and these three had been together only a short time before in perfect friendliness.   There were communicating doors between the rooms occupied by these two sisters and the room occupied by the wife of

the deceased and her children.   The elder of the sisters had been in that room a very short while before the tragedy in order to recover one of her garments which she had left there, and the absent husband was expected.   Under these circumstances, it is apparent that the admission of this testimony was highly prejudicial to the accused, and error of such serious consequence as entitled him to a reversal upon this ground.

In this connection, it is noted also that the attorneys for the prosecution undertook, by insinuating questions to the accused and to the wife of the deceased, to show undue and improper intimacy, as by the writing and receiving of a note and being confronted therewith by Iva Poff, a sister of the deceased.   All of this was categorically denied by the witnesses, and no effort was thereafter made to establish the facts insinuated either by Iva Poff or any other witness.

While the liberties of a cross-examiner are very great, they do not extend far enough to justify such a practice. It should be avoided by prosecuting attorneys and should be condemned by the courts.

Another exception grows out of the giving of instruction No. 11.

[8] "The court instructs the jury that if you believe from the evidence beyond a reasonable doubt, that the accused allowed the wife of the deceased to get in his bed or allowed her to enter into acts leading in the mind of a reasonable man to a commission of the wrongful act of illegal intercourse with the wife of the deceased and had in contemplation that the deceased, the husband, would or might interfere or would or might make an assault upon the accused because of great passion aroused by such act on the part of the accused and the accused armed himself with a deadly weapon with intent to take the life of the deceased or do him some

serious bodily harm should it become necessary to save his own life in the course of such interference or of such attack; that accused under such circumstances did take the life of the deceased in pursuance of such intent, then such killing is willful, deliberate and premeditated killing and is murder in the first degree.''

This instruction, in our view, is clearly erroneous and harmful. It is also in conflict with instruction No. 6, given on behalf of the accused. It is erroneous for the reasons previously indicated herein, there being no admissible evidence to the effect that the accused allowed the wife of the deceased to get into his bed. Nor is there any evidence to justify the suggestion of the instruction that the accused armed himself with a deadly weapon with the intent to take the life of the deceased. Based upon these erroneous views of the evidence, it absolutely denies the accused the right of self-defense, and in this it is in direct conflict with instruction No. 6 for the accused, which tells the jury, under substantially similar conditions, that the accused had the right to defend himself from a murderous attack by the deceased, and that if they believed that he was so attacked and only shot in defending himself from serious bodily harm, that they should find him not guilty.

[9] There is some conflict in the cases as to whether an adulterer who is caught in the act of adultery by a wronged husband, has the right to invoke the doctrine of self-defense when immediately attacked under these circumstances. In some cases accused persons have been denied the right of self-defense upon the ground that they were thus shown to be in fault in bringing on the difficulty, under the rule that one who first arms himself and then brings on a difficulty cannot invoke the right of self-defense. We shall not enter upon this discussion here, because the attack upon the accused

was not made under such circumstances. The fault, if any, of the wife, however grave it may have been, was past. She had been taken to her own room by her husband and the accused was resting quietly in his own chamber. If it be true that the husband undertook to take the law in his own hands and thus to attack him, as the evidence introduced in behalf of the accused indicates, then there can be no doubt, in our view, however lenient public opinion may be as to the crime of a wronged husband under such conditions, that there is no law which justifies a murderous attack by the husband under the circumstances here shown, and the accused here clearly had the right to defend himself. This right of self-defense the court denied (in giving instruction No. 11), and this also constitutes harmful and reversible error.

The debatable question to which we have referred is discussed in *State* v. *Larkin*, 250 Mo. 218, 157 S. W. 600, 46 L. R. A. (N. S.) 13, note.

We do not mean by anything we have failed to say to approve the precise language of any of the instructions complained of. What we do mean is that the case should be retried and the jury fully and clearly instructed, if the evidence be the same on the next trial, to the effect that the accused had the right to defend himself from the attack of the angry husband, the deceased, if he was the aggressor.

*Reversed.*