## STATE v. CARL PHILLIPS AND LILLIE PHILLIPS.

(Filed 9 July, 1954.)

**1. False Pretense § 1—**

While the offense of false pretense ordinarily may not be predicated alone upon defendant's promise to do something, it may be based upon a false factual representation effective only by reason of being coupled with a false promise.

**2. False Pretense § 2—**

Evidence tending to show that defendant falsely represented to a certain person that a criminal prosecution against him was imminent, and that defendant falsely promised such person that defendant could prevent the criminal prosecution and would do so if such person furnished him a sum to be paid the public official concerned, plus another sum as a fee to defendant for his services, and that in reliance upon the false representation and false assurance such other person paid defendant these sums, which defendant converted to his own use, is sufficient to be submitted to the jury on a charge of obtaining money by false pretenses.

**3. Conspiracy § 6—**

A conspiracy is an agreement of two or more persons to do an unlawful act or to do a lawful act in an unlawful manner, and such agreement must be proven directly or by evidence of facts from which the agreement may be legally inferred and not such as raise a mere suspicion.

**4. Same—**

The association between a husband and wife, living in the marital state, at the time the husband obtained money by false pretense from a third person, has no probative force in establishing a conspiracy between them to commit the offense. As to whether one spouse may be guilty of conspiracy with the other spouse, *quaere?*

**5. Same—**

The mere subsequent possession by a wife of a portion of the money obtained by her husband from a third person by false pretense has no probative force in establishing a prior agreement between the husband and wife to commit the crime, or even to charge her with guilty knowledge of how the proceeds were obtained.

**6. Same—A person cannot retroactively conspire to commit a previously consummated crime.**

The State's evidence tended to show that defendant husband obtained money by false pretense from a third person under the guise of preventing a purported criminal prosecution of such third person by the Board of Public Welfare for aiding and obtaining unwarranted old age assistance benefits. *Held:* A statement by defendant wife to such third person, after the alleged false pretense had been practiced, that if such third person deposited his money outside the city, the Board wouldn't know he had it, does not tend to show that the wife conspired with the husband to commit the offense of false pretense.

**7. Solicitors § 3—**

Prosecuting attorneys owe the duty to the State, the accused whom they prosecute, and the cause of justice they serve, to observe the rules of practice created by law to give those tried for crime the safeguards of a fair trial.

**8. Criminal Law § 42c—**

In the cross-examination of the male defendant, the solicitor asked him numerous questions which assumed to be facts the unproved insinuations of defendant's guilt of a number of collateral offenses. *Held:* The cross-examination was improper.

**9. Same—**

If a prosecuting attorney wishes to vouch for the existence or the truth of a fact in the trial of a cause, he should retire from the case, have another appointed to prosecute, take the stand as any other witness, give competent evidence, and submit himself to cross-examination.

**10. Same—**

Questions asked the male defendant on cross-examination to impeach him as to collateral matters which are so framed as to assert in advance the untruth of defendant's denials, *held* to violate the rule that the State is bound by the answer of the accused to such questions.

**11. Same—**

It is improper for the solicitor to ask defendant on cross-examination questions insinuating that defendant's brother had been convicted of an offense.

**12. Same—**

The solicitor on cross-examination of defense witnesses and the *feme* defendant asked numerous questions assuming to be facts the unproved insinuations of the male defendant's guilt of a number of collateral offenses, together with insinuations that the male defendant had aided his wife in despoiling a helpless orphan of her inheritance and that the male defendant's brother had been guilty of a collateral offense. *Held:* The cross-examination was improper.

**13. Same—**

In cross-examining defendant and the witnesses for the defense, the solicitor may not, by insinuating questions or by other means, place before the jury incompetent and prejudicial matters not legally admissible in evidence.

**14. Criminal Law § 40d—**

The State may not show by cross-examination of defense witnesses specific acts of misconduct of accused to show the bad character of the accused.

**15. Criminal Law § 42c—**

While the solicitor may ask defense witnesses questions tending to discredit their testimony, no matter how disparaging the questions may be, he may not, on cross-examination of defense witnesses, needlessly badger or humiliate them by impertinent or insulting questions which he knows, or should know, cannot possibly elicit any competent or relevant testimony, such as that the witness' brother-in-law was a chronic thief, etc.

**16. Criminal Law § 81c (7)—**

Where the prosecuting attorney persists in asking on cross-examination of defendant and defense witnesses improper questions assuming defendant's guilt of a number of collateral offenses and of wrongdoing, all of which questions are objected to by defendant, *held*, such persistent interrogations by the solicitor in violation of the rules governing cross-examination are prejudicial and entitle defendant to a new trial notwithstanding the court's action in sustaining objection to some of the questions without comment, and its later instruction that the questions of the solicitor did not constitute evidence.

APPEAL by defendants from *Patton, Special Judge,* and a jury, at the November Term, 1953, of the Superior Court of GASTON County.

Criminal prosecution upon indictments charging both a conspiracy to obtain money by false pretenses and actually obtaining money by false pretenses.

Carl Phillips and Lillie Phillips are husband and wife, and live together in the marital state at Gastonia. They were indicted jointly for conspiring to obtain money from Ed Lynn by false pretenses. Carl Phillips was indicted singly for actually obtaining money from Ed Lynn by false pretenses. The two indictments were consolidated by consent for the purpose of trial. Both sides offered evidence at the trial.

The State's evidence was sufficient to make out this case against Carl Phillips:

Carl Phillips ascertained that Lynn had aided his deceased wife in drawing substantial old age assistance benefits through the agency of the Gaston County Board of Public Welfare while he had about $9,500.00 on deposit with financial institutions at Gastonia, and that Lynn was fearful of criminal prosecution at the instance of the Superintendent of Public Welfare of Gaston County on that account. Carl Phillips thereupon falsely represented to Lynn that the Superintendent of Public Welfare of Gaston County had informed him that he had already reached the decision to have the feared criminal prosecution brought against Lynn at once. Carl Phillips combined his false representation of fact to Lynn with the false assurance and the false promise that he could prevent the threatened criminal prosecution by paying the Superintendent of Public Welfare of Gaston County $5,000.00, and that he would do so if Lynn would furnish him such sum for that purpose and give him the additional sum of $300.00 as a fee for the service. Carl Phillips made the false representation, the false assurance, and the false promise with intent to deceive Lynn and defraud him of his money. Lynn relied upon the false representation, the false assurance, and the false promise and was induced by them to deliver $5,300.00 to Carl Phillips, who proceeded to convert the same to his own use.

The State did not introduce any direct proof of any conspiracy between the defendants to commit the offense charged. It undertook to establish its allegations on this phase of the litigation by offering evidence sufficient to show these circumstances: (1) That Lillie Phillips associated with her husband about the time named in the indictments; (2) that Lillie Phillips told Lynn that if he would deposit his money in a bank outside Gastonia the Gaston County Board of Public Welfare "wouldn't know" he had it; and (3) that about four hours after her husband's alleged crime, Lillie Phillips had some undefined part of the money obtained by him from Lynn in her possession at their home. This evidence did not directly

disclose that Lillie Phillips had any knowledge of her husband's alleged offense, or that he had obtained the money in question from Lynn. It did indicate, however, that her statement to Lynn occurred after her husband had made his representation, assurance, and promise to Lynn, and had obtained $5,000.00 from him for ostensible payment to the Superintendent of Public Welfare of Gaston County; that her statement to Lynn was made during a conversation between her and Lynn in the absence of her husband; and that her statement to Lynn was prompted by something said to her by Lynn during such conversation.

The testimony offered by the defendants at the trial tended to exonerate them from all wrongdoing.

The jury found the defendants guilty as charged in the indictments; the presiding judge sentenced them to imprisonment as felons; and the defendants appealed, assigning errors. The assignments of error assert that each defendant is entitled to a reversal for insufficiency of proof, or in the alternative to a new trial for improper conduct on the part of the solicitor.

*Attorney-General McMullan and Assistant Attorney-General Love for the State.*

*Verne E. Shive and Max L. Childers for the defendants.*

BARNHILL, C. J. The following opinion was prepared and filed by ERVIN, J., prior to his resignation as a member of this Court. We adopt it with due credit to *Justice Ervin* for its composition and for the research required in its preparation.

The male defendant is not entitled to a reversal for insufficiency of proof upon the indictment charging him with actually obtaining money from Lynn by false pretenses. To be sure, the State's evidence shows that Lynn relied in part on the male defendant's promise to do something, and the law declares that a promise to do something is ordinarily not sufficient to serve as a pretense, no matter how fraudulent it may be. *S. v. Knott,* 124 N.C. 814, 32 S.E. 798. The State's evidence is ample to show, however, that the male defendant's promise was combined with his false factual representation concerning the Superintendent's supposed statement to him, and that Lynn relied in part on the false factual representation in parting with his money. As a consequence, this phase of the case falls within the purview of this rule: "While . . . the crime is not committed by a mere false promise, a false statement of fact may become effective only by being coupled with a false promise. Where this is the case, the mere fact that the false representation of fact is accompanied by a promise does not render it innocuous or relieve it of its criminal character; the statement of fact and the promise may be considered as together constituting the false pretense and a conviction may follow, or, if

the statement of fact and the promise can be separated, and prosecutor relied in part on the former, the promise may be disregarded and accused may be convicted on the statement of fact, notwithstanding he may also have relied in part on the promise and would not have yielded to the false statement alone." 35 C.J.S., False Pretenses, section 9.

The case on appeal compels us to adjudge that the defendants are entitled to a reversal for insufficiency of proof upon the indictment charging them with conspiring to obtain money from Lynn by false pretenses. For this reason, we omit discussion of the question whether the statutes liberating the wife from her merged identity with the husband have abrogated the common law rule that one spouse cannot be guilty of conspiracy with the other spouse alone. *People v. Miller,* 82 Cal. 107, 22 P. 934; *Dalton v. People,* 68 Colo. 44, 189 P. 37; *Smith v. State,* 48 Tex. Cr. 233, 89 S.W. 817; 11 Am. Jur., Conspiracy, section 7; 15 C.J.S., Conspiracy, section 36.

The Supreme Court of Indiana made these highly relevant observations in *Johnson v. State,* 208 Ind. 89, 194 N.E. 619: "There must be an agreement or joint assent of the minds of two or more before there can be a conspiracy. Such agreement or joint assent of the minds need not be proved by direct evidence. . . . There must be, however, an agreement, and there must be such evidence to prove the agreement directly or such a state of facts that an agreement may be legally inferred. Conspiracies cannot be established by a mere suspicion, nor does evidence of mere relationship between the parties or association show a conspiracy." See, also, in this connection: 15 C.J.S., Conspiracy, section 93.

The State did not produce a scintilla of direct evidence that Lillie Phillips entered into an agreement with her husband to obtain money from Lynn by false pretenses. The circumstantial evidence invoked by the State on this aspect of the case may beget suspicion in imaginative minds. It does no more. The association between the defendants about the time named in the indictments was normal for persons living in the marital state. We cannot assign such association any probative value without subscribing to the doctrine that husband and wife must dwell in a state of separation to escape legal accountability for each other's transgressions. This we are unwilling to do. The mere subsequent possession by a wife of a portion of the proceeds of her husband's crime does not suffice to establish a prior agreement between them to commit the crime. Indeed, such circumstance is insufficient in law and logic even to charge the wife with guilty knowledge of how the proceeds were obtained. *S. v. Larkin,* 229 N.C. 126, 47 S.E. 2d 697; *S. v. Yow,* 227 N.C. 585, 42 S.E. 2d 661; *S. v. Oxendine,* 223 N.C. 659, 27 S.E. 2d 814; *S. v. Lowe,* 204 N.C. 572, 169 S.E. 180. The State's evidence indicated that the *feme* defendant made her statement to Lynn and acquired her possession of a

portion of the money in question after the male defendant had practiced the alleged pretenses upon Lynn. In the very nature of things, persons cannot retroactively conspire to commit a previously consummated crime. *Morris v. State,* 146 Ala. 66, 41 So. 274.

This brings us to the question whether the male defendant is entitled to a new trial upon the indictment charging him with actually obtaining money from Lynn by false pretenses on account of improper conduct on the part of the solicitor.

Prosecuting attorneys are in a very peculiar sense servants of the law. *S. v. Gorman,* 219 Minn. 162, 17 N.W. 2d 42. They owe the duty to the State which they represent, the accused whom they prosecute, and the cause of justice which they serve to observe the rules of practice created by law to give those tried for crime the safeguards of a fair trial. *S. v. Eagle,* 233 N.C. 218, 63 S.E. 2d 170; *United States ex rel. Darcy v. Handy,* 203 F. 2d 407; *State v. Grillo,* 11 N.J. 173, 93 A. 2d 328; *S. v. Bealin,* 201 S.C. 490, 23 S.E. 2d 746; *State v. Murphy,* 92 Utah 382, 68 P. 2d 188; *Wilson v. Commonwealth,* 157 Va. 962, 162 S.E. 15; *State v. Seckman,* 124 W. Va. 740, 22 S.E. 2d 374.

Counsel for the defense assert that the solicitor purposely and persistently violated his duty in this respect in his cross-examination of the male defendant and his witnesses, and in that way nullified the male defendant's right to a fair trial.

The solicitor put these questions to the defendant Carl Phillips over his objection on cross-examination: (1) "I'll ask you if you didn't break in the post office at Lowell and procure Robert Phillips to go and tell the Federal authorities that he saw Leon Phillips break into the Post Office and to get you out of trouble?" (2) "What did you do with the police radio off of that police car or jeep down at Lowell?" (3) "What other property of the Town of Lowell did you carry off?" (4) "You were willing to pay a good bit to get out there and take money off the people?" (5) "You remember the colored man down in Lowell. You found a shotgun in his house and took $125.00 off of him?" (6) "When you were police chief down in the Town of Lowell, did you take a boy's car away from him that you caught speeding and refuse to turn it over to him? You remember taking that boy's car away from him?" (7) "Well, now, I'll ask you if you don't know that on July 15, 1950, if you didn't take from a boy by the name of Jack Shields the sum of $125.00 and take the money and tell him you were going to give it to the mayor down there to pay his fine when you had arrested him for driving under the influence?" (8) "And if you didn't keep that money and failed to turn it in?" (9) "I'll ask you if you don't remember telling Jack Shields, when he came to see about the matter, after he had paid you the $125.00, that it wouldn't be necessary for him to see the mayor, that you had already talked with

him and the mayor said it was all right to reduce the charge to reckless driving and driving with improper brakes and he could pay you the sum of $125.00, that you told him he didn't have to come to court, and if you don't know you didn't turn the money into the mayor?"    (10) "How many people do you reckon you have cheated out of their money in your lifetime?"    (11) "This is not the first old man you have beaten out of money, is it?"    (12) "I say you made it a practice for several years of getting folks and taking them over there and taking money away from them?"    (13) "Do you deny you cheated an old woman in Stanley out of $3,000.00?"    (14) "How much money did you take off of Sam Gillespie?"    (15) "I'll ask you if you didn't enter a suit against a warehouse company you were working for and allege you had hurt yourself lifting a sack or dropping a sack when you knew you hadn't?"    (16) "Phillips, how many folks do you owe money around here?"    (17) "I'll ask you if you don't know this brother you got the money from has been convicted in Federal Court with you for conspiracy, and if he hasn't been convicted in this court for being a fence for stolen property?"

The presiding judge sustained the objections to the tenth, sixteenth, and the seventeenth questions, and the male defendant denied all the insinuations incorporated in the other fourteen questions.    The first nine questions were concerned with the period of the male defendant's service as a policeman, and the last question related to the male defendant's brother Mack Phillips, who had no connection with the case beyond the bare fact that he allegedly supplied the male defendant with money to pay the premium on his appearance bond.

When he phrased the seventeen questions under scrutiny and propounded them to the male defendant, the solicitor assumed the unproved insinuations in them to be facts, and in that way assured the jury upon his official authority that the male defendant had burglarized a Post Office, suborned the commission of perjury, committed thefts, asked and received bribes, practiced extortion, and embezzled public moneys while serving as a policeman; that the male defendant had cheated and defrauded many persons of their moneys; that the male defendant had asserted a spurious claim in a lawsuit; that the male defendant was a dishonest man who refused to pay his just debts; and that the male defendant's brother had been convicted of receiving stolen goods with knowledge of their stolen character.    This interpretation of the questions harmonizes with that put upon them by the solicitor himself during the progress of the trial.    While the solicitor was asking the male defendant the questions pertaining to his service as a policeman at Lowell, counsel for the defense appealed to the presiding judge to protect their client against the cross-examination on the ground that it was tantamount to the solicitor's testifying.    The

solicitor made this instant retort in the presence of the jury: "I'm a pretty good witness. You know I lived at Lowell."

It thus appears that in cross-examining the male defendant, the solicitor repeatedly violated the rule of law which forbids a prosecuting attorney to inject into the trial of a cause to the prejudice of the accused by argument or by insinuating questions supposed facts of which there is no evidence. *S. v. Russell,* 233 N.C. 487, 64 S.E. 2d 579; *S. v. Thompson,* 217 N.C. 698, 9 S.E. 2d 375; *S. v. Phifer,* 197 N.C. 729, 150 S.E. 353; *S. v. Green,* 197 N.C. 624, 150 S.E. 18; *S. v. Tucker,* 190 N.C. 708, 130 S.E. 720; *S. v. Evans,* 183 N.C. 758, 111 S.E. 345; *S. v. Corpening,* 157 N.C. 621, 73 S.E. 214, 38 L.R.A. (N.S.) 1130; *S. v. Goode,* 132 N.C. 982, 43 S.E. 502; *S. v. Tuten,* 131 N.C. 701, 42 S.E. 443; *Hash v. State,* 48 Ariz. 43, 59 P. 2d 305; *People v. Anthony,* 185 Cal. 152, 196 P. 47; *People v. Letterich,* 413 Ill. 172, 108 N.E. 2d 488; *People v. Tilley,* 406 Ill. 398, 94 N.E. 2d 328; *Albertson v. Commonwealth,* 312 Ky. 68, 226 S.W. 2d 523; *Commonwealth v. Broeckey,* 364 Pa. 368, 72 A. 2d 134; *Commonwealth v. Gibson,* 275 Pa. 338, 119 A. 403; *Robbins v. State,* 100 Tex. Cr. 592, 272 S.W. 175; *Ballard v. State,* 97 Tex. Cr. 455, 262 S.W. 85; *Barnard v. Commonwealth,* 134 Va. 613, 114 S.E. 563. If a prosecuting attorney wishes to vouch for the existence or the truth of a fact in the trial of a cause, he should retire from the case, have another appointed to prosecute, take the stand as any other witness, give competent evidence, and submit himself to cross-examination. *Macon v. Commonwealth,* 187 Va. 363, 46 S.E. 2d 396; 23 C.J.S., Criminal Law, section 1087.

The seventeen questions under present review are virtually identical in manner of phrasing with those put to the accused by the commonwealth's attorney in *Thurpin v. Commonwealth,* 147 Va. 709, 137 S.E. 528, where the Supreme Court of Appeals of Virginia made these trenchant observations: "The form of these questions was highly improper. They were more in the nature of testimony and an argument by the commonwealth's attorney before the taking of the testimony had been completed and contained statements of facts not supported by the evidence. The court erred in not requiring the attorney for the commonwealth to put his questions in the usual form, interrogating the witness as to each matter concerning which he wished him to testify."

The questions were ostensibly designed in large degree to elicit from the male defendant impeaching matters of a collateral character. They were so framed, however, as to assert in advance the untruth of his denials. In consequence, they deprived him of the benefit of the evidential rule that the State is bound by the answers of the accused or any other witness for the defense when it cross-examines him as to collateral matters for the purpose of impeachment. *S. v. Broom,* 222 N.C. 324, 22 S.E. 2d 926; *S. v. Jordan,* 207 N.C. 460, 177 S.E. 333; *S. v. Sauls,* 199 N.C. 193,

STATE *v.* PHILLIPS.

154 S.E. 28. The question insinuating that the male defendant's brother had been convicted of receiving stolen goods with knowledge of their stolen character was not proper for any purpose. The law is not so callous to justice as to condemn an accused for the sin of another, even though the other is his blood brother.

The solicitor asked the *feme* defendant Lillie Phillips these questions on cross-examination over the objections of the male defendant: (1) "Mack Phillips, that's old Mack, the fence around here in East Gastonia?" (2) "I'll ask you if Mack wasn't indicted while Carl was hiding out in South Carolina?" (3) "Describe it. It wasn't the kind Carl beat Sam Gillespie half to death with, was it?" (4) "How much money have you and Carl taken out of the estate of this little girl, Hilda Jean Kincaid?" (5) "I'll ask you if you know whether or not your husband took any money off of Sam Gillespie?" (6) "I'll ask you if you know whether your husband, on July 15, 1950, took $125.00 from Jack Shields to fix a case in which your husband charged his brother Jimmie of driving under the influence?" (7) "I'll ask you if you don't know that while your husband was chief of police in Lowell that if he didn't procure one Robert Phillips to falsely testify that Leon Phillips had broken into the Post Office at Lowell, and if you don't know that the truth about it was your husband broke in there?" When the third question is placed in its context, it appears that it was prompted by the testimony of the *feme* defendant that Deputy Sheriff Groves threatened to use a blackjack at the time of his arrest of the male defendant upon the charges involved in this case. The presiding judge sustained the objections to the first, second, third, fifth, sixth, and seventh questions, and the *feme* defendant denied the implication of wrongdoing on the part of herself and her husband embodied in the fourth question.

The solicitor propounded these questions to B. G. Ward, a witness for the defense, on cross-examination over the objections of the male defendant: (1) "Did Mr. Phillips tell you about how much money he made while he was chief of police in Lowell taking money off people?" (2) "Did he tell you he had taken approximately $2,500.00 out of the $3,400.00 that the little girl over at his house had gotten from her dead father?" (3) "Did he tell you about getting set up in business here in the grocery business by defrauding every grocer in Cowpens, South Carolina?" (4) "I'll ask you if you don't know the general reputation of that place is that it is a place where stolen goods are disposed of?" The fourth question referred to an automobile service station operated by the male defendant. The presiding judge sustained the objections to the third and fourth questions, and the witness Ward answered the first and second questions in the negative.

The solicitor put two questions to Mrs. Love Jenkins, a witness for the defense over the objections of the male defendant relative to her brother-in-law Rub Jenkins, who was not connected in any way with the case. These questions were as follows: (1) "Don't you know that Rub Jenkins has been stealing around this country for the last five years and that Carl Phillips and his brother Mack Phillips have been selling everything Rub could steal?" (2) "Is it up there between the county home and the Town of Dallas in a brick building in a wire fence?" When the second question is put in its context, it appears that it amounted to an inquiry whether Rub Jenkins was not imprisoned in the State prison camp at Dallas at the time of the trial of the case. The presiding judge sustained the objection to the first question, and Mrs. Jenkins made this response to the second: "I don't know."

The solicitor asked John Henry Jenkins, Jr., a witness for the defense, these questions on his cross-examination over the objections of the male defendant: (1) "I'll ask you if you don't know you and Carl Phillips made it up as soon as you got the money off Lynn you would take the old man to Tennessee and dump him out at the Veterans' Hospital?" (2) "I'll ask you if, when he was chief of police at Lowell, if he didn't fix up several things you had done down there, stealing and otherwise?" The witness denied the insinuations incorporated in each question. He asserted in addition that he "never stole anything."

Two of these questions illustrate in graphic fashion how far afield the cross-examination went. The case on appeal, which was settled by stipulation of counsel, indicates that Hilda Jean Kincaid was orphaned at an early age by the accidental death of her father; that the defendants admitted her to their home, and reared her to maturity; that she still resides with them as a result of her own affectionate choice; and that during her minority the defendants received some compensation from Hilda Jean Kincaid's highly reputable guardian under appropriate orders of court for furnishing her with care, clothing, food, and shelter for many years. The fourth question asked Lillie Phillips and the second question put to B. G. Ward have no basis outside these events. These questions were nevertheless so framed as to suggest to the jury the damning notion that the male defendant and his wife had despicably despoiled a helpless orphan of her inheritance.

When he phrased the fifteen questions under present scrutiny and propounded them to Lillie Phillips, B. G. Ward, Mrs. Love Jenkins and John Henry Jenkins, Jr., the solicitor assumed the unproved insinuations in them to be facts, and in that way assured the jury upon his official authority that the male defendant had burglarized a Post Office, suborned the commission of perjury, asked and received bribes, committed malfeasances, and practiced extortion while serving as a policeman; that the

male defendant had aided his wife in despoiling a helpless orphan of her inheritance; that the male defendant had beaten one Gillespie "half to death" with a blackjack, and taken money from him; that the male defendant had procured the means of setting himself up in the grocery business in Gastonia "by defrauding every grocer in Cowpens, South Carolina"; that the male defendant's brother Mack Phillips was a notorious "fence" for stolen property in Gaston County; that the male defendant and his brother Mack Phillips had jointly plied the nefarious trade of receiving and selling stolen goods with knowledge of their stolen character throughout the five years next preceding the trial of the case; that an automobile service station operated by the male defendant had even acquired "the general reputation" of being "a place where stolen goods are disposed of"; that the male defendant's brother Mack Phillips had been indicted in Gaston County for receiving stolen goods with knowledge of their stolen character; and that the male defendant had thereupon taken flight to South Carolina, where he lurked in concealment to avoid prosecution on the same charge.

When he cross-examined the *feme* defendant and the witnesses for the defense in this manner, the solicitor repeatedly violated the rule of law which invalidated his cross-examination of the male defendant. In so doing, he also repeatedly violated the additional rule of law which forbids a prosecuting attorney to place before the jury by argument, insinuating questions, or other means, incompetent and prejudicial matters not legally admissible in evidence. *S. v. Tilley,* 239 N.C. 245, 79 S.E. 2d 473; *S. v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664; *S. v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35; *S. v. Little,* 228 N.C. 417, 45 S.E. 2d 542; *S. v. Buchanan,* 216 N.C. 709, 6 S.E. 2d 521; *United States v. Remington,* 191 F. 2d 246; *Filippelli v. United States,* 6 F. 2d 121; *People v. Irby,* 67 Cal. App. 520, 227 P. 920; *People v. Bennett,* 413 Ill. 601, 110 N.E. 2d 175; *Rohlfing v. State,* 230 Ind. 236, 102 N.E. 2d 199; *Whitaker v. Commonwealth,* 314 Ky. 303, 234 S.W. 2d 971; *People v. Draper,* 278 App. Div. 298, 104 N.Y.S. 703; *Combs v. State,* 87 Okl. Cr. App. 283, 197 P. 2d 524; *Gray v. State,* 191 Tenn. 526, 235 S.W. 2d 20; *Lackey v. State,* 148 Tex. Cr. R. 623, 190 S.W. 2d 364; 23 C.J.S., Criminal Law, section 1087.

The solicitor who prosecuted this case in the Superior Court is an able and alert advocate, who is well versed in law and knows what he is about. He must have known the familiar legal rule that the State cannot offer evidence of specific acts of misconduct by cross-examination of defense witnesses or otherwise to show the bad character of the accused. *S. v. Nance,* 195 N.C. 47, 141 S.E. 468; *S. v. Adams,* 193 N.C. 581, 137 S.E. 657; *S. v. Holly,* 155 N.C. 485, 71 S.E. 450. Hence, the conclusion seems inescapable that his intention in asking the questions under present discussion was to portray the male defendant to the jurors as a bad man of

criminal practices and proclivities by insinuations of specific acts of misconduct which he knew he could not bring to their attention by legally admissible evidence. *People v. Bush,* 300 Ill. 532, 133 N.E. 201; *Fry v. State* 91 Okl. Cr. App. 326, 218 P. 2d 643.

Anyone experienced in courtroom psychology knows that where a prosecuting attorney persists in asking witnesses improper questions for the purpose of getting before the jurors prejudicial matters which the law does not permit them to hear, the questions produce a highly prejudicial effect on the minds of the jurors, even though the trial court refuses to permit the witnesses to answer. *Jones v. Commonwealth,* 191 Ky. 485, 231 S.W. 31; *Stewart v. Commonwealth,* 185 Ky. 34, 213 S.W. 185.

The solicitor violated other legal rules in cross-examining Mrs. Love Jenkins and John Henry Jenkins, Jr. The Constitution of North Carolina declares that "in all criminal prosecutions every man has the right to be informed of the accusation against him and to confront the accusers and witnesses with other testimony." Article I, Section 11. As a result of this constitutional guaranty, witnesses for the defendant in a criminal action are compelled to come to court whether they desire to do so or not. The conduct and testimony of witnesses for the defense are necessarily subject to such attack and criticism by the prosecution as the circumstances reasonably justify. For this reason, they may be subjected by the prosecuting attorney to question tending to discredit their testimony, no matter how disparaging the questions may be, if the questions are based on information and are asked in good faith. *S. v. Broom, supra;* 23 C.J.S., Criminal Law, section 1087. But the law does not contemplate that witnesses who attend court and testify for the defense in obedience to its compulsory process are to be needlessly badgered and humiliated by the prosecution. *Lamborn v. Hollingsworth,* 195 N.C. 350, 142 S.E. 19. Consequently, the law forbids the prosecuting attorney to put to a witness for the defense an impertinent and insulting question which he knows or should know cannot possibly elicit any competent or relevant testimony. 70 C.J., Witnesses, section 1012. When he put his first question to John Henry Jenkins, Jr., the solicitor inferentially charged the witness with complicity in the crime alleged against the male defendant, although the evidence for the State itself exonerated the witness from the charge. When he asked Mrs. Love Jenkins the questions insinuating that her brother-in-law Rub Jenkins was a chronic thief perhaps undergoing imprisonment at the State prison camp at Dallas, the solicitor propounded to the witness impertinent and insulting questions which he knew or should have known could not possibly elicit any competent or relevant testimony. Mrs. Jenkins was neither legally nor morally answerable for the conduct or whereabouts of her brother-in-law, and ought not to have been questioned in regard thereto.

Counsel for the defense objected with promptitude to each question. In addition, they appealed to the presiding judge in express terms on several occasions to keep the cross-examination of their clients and witnesses within proper bounds. The judge overruled some objections and sustained others without comment, and gave the jury formal instructions in several instances to the effect that the questions of the solicitor did not constitute evidence. The mild rulings of the judge did not have any deterring effect on the solicitor, who persisted in his improper and prejudicial cross-examination throughout the presentation of the testimony of the defense. A painstaking consideration of the case on appeal leaves us with the abiding conviction that the solicitor's persistent violation of the rules of practice governing the cross-examination of those tried for crime and their witnesses deprived the male defendant of that fair trial to which all men are entitled, no matter how good or how bad they may be. This conclusion necessitates a new trial of the male defendant on the indictment charging him with obtaining money by false pretenses.

The solicitor who prosecuted this case in the Superior Court is an able and diligent public servant. He has rendered the State valuable service in the solicitorial office. No doubt he was moved to excesses in his cross-examination by an earnest and over-zealous desire to bring to justice one whom he deemed to be a great evil-doer. We commend to those servants of the law who labor under like temptations this admonition: "Ministers of the law ought not to permit zeal for its enforcement to cause them to transgress its precepts. They should remember that where law ends, tyranny begins." *S. v. Warren*, 235 N.C. 117, 68 S.E. 2d 779.

*New trial* as to male defendant on the indictment for false pretense.

*Reversed* as to both defendants on the indictment for conspiracy.