15483

STATE v. BELIN

(23 S. E. (2d), 746)

*Mr. C. T. McDonald,* of Florence, Counsel for Appellant,

*Mr. J. Reuben Long,* Solicitor, of Conway, and *Mr. George W. Keels,* of Florence, appeared for The State, Respondent.

January 4, 1943.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BONHAM:

Elizabeth Bealin was found dead in the home where she and her husband and their two small children resided in the Kingsburg section of Florence County, at about noon on Sunday, November 2, 1941, whereupon her husband, Monroe Bealin, the defendant, was charged with murder arising out of the death of his wife, and was tried upon that charge, to which he plead not guilty, at the January term, 1942, of the Court of General Sessions for that county.

Upon the trial, before the Honorable A. L. Gaston, presiding Judge, and a jury, there was evidence that Elizabeth Bealin had died from hemorrhage as a result of wounds from a shotgun whose shot had penetrated her right side and chest. No one testified to having witnessed her death or the event which caused it. For the purpose of establishing its case, the State relied upon the circumstantial evidence which was adduced by various witnesses.

In addition to his general plea of not guilty, the defendant sought to prove that he was not at his residence when his wife was shot, having left his home at about half past eight o'clock that morning, and after paying a brief call at the home of another Negro man, spent the remainder of the morning at a filling station, about eight-tenths of a mile from his home, where he customarily worked in addition to farming, and, the day being Sunday, that he left the filling station shortly before noon in order to meet a previously arranged engagement with his wife to take her to church; and that when he reached his home for that purpose, he found his wife lying dead in a corner of a room in their home, and, after a brief examination of her body, that he went immediately to the home of neighbors, about one hundred yards from his residence, and reported the matter, whereupon one of his neighbors, at his request, went with him to his home to look into the situation. Shortly thereafter, Bernard Currie, a friend of the defendant, also came and saw the situation, and then went away for the purpose of narrating the fact to certain white men in the vicinity

who likewise went to the scene, after which 'they were joined by a crowd of approximately one hundred spectators.

The witnesses for the State, and those for the defendant, were about evenly balanced in number, and in most of the material aspects their testimony followed two sharply conflicting lines, but witnesses for both parties testified to having seen the defendant at the filling station during the course of that morning. Neighbors testified to having heard the sound of a shot coming from the direction of the home of Elizabeth Bealin and Monroe Bealin at some time between eleven o'clock that morning and noon, but it was not shown that the latter was present at the time the shot was heard. The State, among other things, sought to establish its charge of murder by offering in evidence certain work-day clothing, but respecting which the testimony was divided as to when the defendant had last worn them. The State offered testimony tending to show that Monroe Bealin was wearing the overalls and other work clothes when he was seen at the filling station on that Sunday morning, and that shortly after the death of his wife, those same articles of clothing were found, bloodstained, near the defendant's home. Witnesses for the defendant who had seen him at the filling station during the course of the morning, and also shortly after his wife had been found dead, testified that on both occasions he had been dressed in his Sunday clothes which were described by the witnesses in terms sufficient to distinguish them from the overalls and work clothes which were found near the home.

When the taking of the testimony had been completed and the jury had been excused, counsel for the defendant renewed an earlier motion, which was likewise refused by the Court, for a directed verdict, following which, in the course of a colloquy between the Court and counsel for both parties, the following discussion was held between the Court and counsel for the defendant:

"The Court: * * * Mr. McDonald, do you think I ought to submit to the jury anything about manslaughter?

"Mr. McDonald: Your Honor, I leave that to the Court. We take the position that he is not guilty of anything.

"The Court: The reason I asked you, I don't want to submit anything to the jury that is not supported by the evidence. * * * I am not inclined to submit the issue of manslaughter to the jury.

"Mr. McDonald: Of course, our position is that he would not be guilty of anything whatever.

"The Court: * * * Unless there is a request along that line, I am not going to charge manslaughter to the jury * * *."

No specific requests to charge were made by counsel for either party, and upon the return of the jury, the charge was delivered by the trial Judge, following which the jury, after deliberation, returned a verdict of guilty with a recommendation for mercy, following which a motion for a new trial was made by counsel for the defendant, and refused by the Court, the grounds of the refused motion forming the basis for the nine exceptions now before this Court.

The seventh exception, which we shall consider first, is: "That his Honor erred in failing to charge the jury on manslaughter, the error being that there was testimony in the case from which the jury could have inferred that if the killing were done by defendant, that the same was done in sudden heat and passion."

The brief paragraph which constitutes the "Statement" in the voluminous typewritten Transcript of Record in the case contains no evidentiary matters, and the very brief paragraph in each of the typewritten briefs of counsel for both sides likewise confine themselves solely to the merest mention of the fact that motions for a directed verdict, and for a new trial, were made and refused. The facts and evidence in the case can be found only by an examination of

the testimony of the two dozen witnesses, as reported in the typewritten Transcript of Record.

In our discussion of the question of manslaughter, and of the subsequent question of alibi, in their relation to this case, we are not, of course, considering the weight and sufficiency of the evidence which, under the instructions it had received, the jury had for its consideration. The credibility of the witnesses and the weight of the testimony on both sides were naturally questions which the jury should, and did, pass upon. Our allusions to the testimony in its relation to the exceptions pertaining to manslaughter and alibi are solely for the purpose of determining whether, under that testimony, the trial Judge should have instructed the jury more fully than he did as to whether, under that testimony, it could properly consider the offense of manslaughter and the defense of alibi. In view of the disposition which we shall make of this appeal, we shall, in this opinion, make as slight references to the testimony as is compatible with a statement of the reasons upon which we base our decision.

While there is no testimony in the record that any person saw the defendant commit the crime of manslaughter (or murder either, for that matter) we cannot agree with the position of the trial Judge that the evidence did not support submitting to the jury the question of manslaughter.

We find in the testimony considerable evidence that the defendant and his wife were on good terms prior to her death, and that any motive for the crime of murder was not only not positively shown by the State, but was negatived in part by at least one of the State's own witnesses. Bernard Currie, a witness for the State, testified that on the afternoon immediately prior to the morning on which Elizabeth Bealin met her death, he had taken his own wife and family, and the defendant and his wife and family, in the witness' automobile, on a shopping expedition to Johnsonville, where both men bought supplies for their families. He testified

that Monroe Bealin made a considerable amount of purchases. The witness saw the defendant bring a number of bundles, some of which the witness knew to contain groceries and cloth and put them in the automobile, whereupon the witness drove the defendant and his family home in that automobile, and at the same time brought the goods which had been purchased, arriving at home at about six-thirty o'clock that afternoon. The witness stated that the supplies which Monroe Bealin purchased were a considerable amount and "a pretty good supply." This witness for the State testified further that on the return trip, the defendant requested him to take the defendant and his wife to church on the following morning, but that no final decision was then made since the witness had already planned to take a crowd on that occasion. He testified further that while he was dressing on Sunday morning, the defendant came to his home and inquired whether the witness would be able to carry out the plan, and that the defendant went away upon being told by the witness that he would do so.

The defendant later confirmed the testimony of the State's witness in the foregoing respect, and in reply to the question: "About how much did you spend for groceries and clothing over there (in Johnsonville) that Saturday evening?" answered: "Right around $12.00 or a little better."

Malachi Bealin, a half-brother of the defendant, testified that he saw and talked with the defendant at the filling station on the Sunday morning in question, and that Monroe Bealin gave him and another brother three bottled drinks and some candy to carry home to Elizabeth Bealin, a habit which had been followed in the past; that the witness complied with the request and delivered the drinks and the candy to Elizabeth Bealin. Freddie Bealin, the brother who accompanied Malachi on that mission, gave similar testimony. There was also other testimony that the drinks and the candy were intended for Monroe Bealin's wife and children. The testimony indicated that Monroe Bealin sent these articles

to his wife about two and one-half hours before she was found dead.

Our examination of the authorities from other jurisdictions as well as those of this State reveals a fairly uniform rule in regard to the question now before us.

In 23 C. J. S., Criminal Law, page 863, § 1288, Sub-section b, we find the following textual discussion:

"Where, under the evidence, accused may be found guilty of any offense necessarily included within the crime charged, the court should so instruct the jury, especially when such instruction has been requested, * * *. As a general rule, where the crime charged is one that admits of degrees, and the evidence tends to establish an offense of a grade lower than that charged, the difference between the different degrees should be made the subject of an explanatory charge. [Citing, in footnote 5, various decisions from the Courts of North Carolina and Georgia.]

" * * * It is erroneous to give an instruction which is calculated to make the jury believe that * * * they either must find him guilty of the higher offense or acquit him, when, under the evidence, they might find him guilty of the lower offense." (Citing, in footnote 13, cases from North Carolina and Georgia.)

In subsection c of the same section, we find further: " * * * it is doubtless true that the conditions are exceptional which warrant a refusal to instruct as to the power to convict of a lower degree of the crime charged, and great care should be preserved not to withhold such instruction unless the case is one in which no possible view of the facts would justify any other verdict except a conviction or acquittal of the crime charged. While if the evidence is of such a character as not to justify a finding of an included or lesser offense the Court may properly refuse or omit to charge as to such offense, *it is always a delicate matter for the court to determine the state of evidence as a matter of law and so to withhold from the jury the right to find as to*

*such included or lesser offense.* Generally, such instruction should be given, unless the evidence positively excludes any inference that the lesser crime was committed, and accused is not required to show facts justifying the conclusion that such lesser crime and not the greater was committed in order to have the instruction given." (Emphasis added.)

In footnote 18 to the above-quoted paragraph there is cited the case of *State v. Dimmitt,* 184 Iowa, 870, 169 N. W., 137, to the effect that: "It is only where court may hold as matter of law that the offense, if any, was the highest possible degree of the offense that included offenses need not be submitted."

And in footnote 19 to the same paragraph is cited the case of *State v. Young,* 22 Wash., 273, 60 P., 650, to the following effect: "Where there is slightest evidence that accused may have committed the degree of the offense inferior to, and included in, the one charged, the law of such inferior degree ought to be given."

Quoting further from the same volume, we find on page 915, § 1317, that: "The court in delivering its charge should guard against an instruction which would withdraw from the consideration of the jury any issue or evidence which they are entitled to consider on the trial of the cause. [Citing *Myers v. State,* 97 Ga., 76, 25 S. E., 252.] An instruction which ignores or otherwise tends to exclude from the consideration of the jury material issues or theories, or a material part of the evidence, *or any other matter which it is proper for them to consider,* is erroneous, \* \* \*." (Emphasis added.) (Citing decisions from North Carolina, Georgia, and other jurisdictions.)

With further reference to the question of instructing the jury as to the grade or degree of the crime with which a defendant is charged, we find on page 947 of the same volume, in § 1325, Subsection c, the prevailing rule that: "\* \* \* such an instruction must be given, *whether requested or not,* where there is evidence, independent of accused's statement,

which tends to prove, and would authorize or warrant a verdict of guilty of, the lower degree or offense, even though there is also *ample* evidence to support a verdict of guilty of the higher degree or offense." (Emphasis added.)

Under its discussion of "Homicide" in 30 C. J., 396, § 641, we find the following: "As a general rule it is proper and the duty of the court upon a trial for homicide, when charging the jury, to state and explain fully the law defining the crime for which defendant is being prosecuted, and every degree or grade of homicide of which he may be convicted under the indictment and the evidence, whether such an instruction is requested or not; * * *. Such an instruction should be given, although defendants' evidence, in support of the lower grade or degree of the offense, is uncorroborated, or defendant offers no evidence and all the evidence for the state tends to show a crime of the highest degree; and, although the evidence points so strongly to the guilt of the accused in the highest degree as practically to exclude any theory of guilt in a lower degree, and the evidence does not suggest the absence of premeditation, it is still the duty of the trial court to instruct in reference to all lower degrees of the crime of which there is any reasonable theory of guilt. *Where there were no eyewitnesses to the killing and the evidence is purely circumstantial, the court should instruct the jury as to the different grades of homicide,* and self-defense, unless it is evident from the whole proof that defendant is either guilty of murder or innocent; but if there is an eyewitness to the homicide, the court need instruct only as to such degrees as are warranted by the proof." (Emphasis added.) (Citing many authorities from various jurisdictions.)

Similarly, on page 417 of the same volume, § 661, there is stated in the text: "Where a statute authorizes a conviction of manslaughter on every trial for murder, the court should in all trials for murder instruct the jury that they may find defendant guilty of manslaughter, * * *."

In footnote 95 to the paragraph from which we have just quoted is cited the case of *State v. Birbiglia,* 149 La., 4, 88 So., 533, 546, the following quotation from which appears in that footnote: "The reason why the judge must instruct the jury, in all prosecutions for murder, that they may render a verdict of manslaughter, is that his failure to do so would leave the jury with no other alternative than to convict the defendant of murder or acquit him entirely. It would be the same as for the judge to instruct the jury as to what the evidence in the case was; whereas the judge has no right to comment upon the facts or evidence in the case."

In the more recent American Jurisprudence, we find the following in volume 26, page 533, Section 541; in discussing "Homicide"; "The weight of authority is to the effect that if the evidence admits of a conviction of a lower degree than that charged or of an included offense, the jury should be instructed that in case of a reasonable doubt between two degrees or offenses, they are to convict of the lesser only, and a general instruction that the guilt of the accused must be shown beyond a reasonable doubt is not sufficient."

The annotation 20 A. L. R., at page 1258, states:

"For the purpose of the present discussion it is assumed to be the law that on the trial of an indictment for a crime which is divided into degrees, or which includes other crimes, if the jury have a reasonable doubt as to the crime, or degree of crime, of which the accused is guilty, the benefit of that doubt must be given to him. Starting with that assumption, the precise question considered herein is whether it is the duty of the trial judge to instruct the jury specifically as to that rule of law.  *  *  *

"The weight of authority is to the effect that if the evidence admits of a conviction of a lower degree than that charged, or of an included offense, the jury should be instructed that, in case of a reasonable doubt between two degrees or offenses, they are to convict of the lesser only, and

a general instruction that the guilt of the accused must be shown beyond a reasonable doubt is not sufficient."

See also the large number of cases collated in 17 S. E. Digest, Keys 307 and 308, under the heading of "Homicide."

Although not directly in point, a very early case of interest in our own State is that of *State v. Kirkland,* 14 Rich., 230, 48 S. C. L., 230, in which case the defendants appealed on the ground that the trial Judge omitted to explain to the jury the distinctions between the different kinds of homicide, and among other grounds, that the trial Judge did not charge the jury that, in any view of the testimony, the defendants might be guilty only of manslaughter. Mr. Chief Justice Dunkin, speaking for this Court, quoted from Archbold's Treatise on Criminal Law to the effect that "if there be any doubt as to the grade of the offence, it is the duty of the Court clearly to define the several grades of homicide, and leave it to the jury to find, from the evidence, of what particular grade the defendant is guilty * * *." After reviewing the pertinent parts of the testimony, the unanimous opinion in that case continues:

"What part of it the jury may have believed, and what part they may have discarded from their consideration as unworthy of credit, this Court may not inquire. It was exclusively for them to determine. But if the jury believed the witnesses, and inferred from their testimony that there was no preconcert to take the life of the deceased, that there was no preconcert or purpose to do him bodily harm, * * * they would have violated no rule of law, by reducing the offence of the prisoners to the crime of manslaughter * * * This Court is of opinion that an additional alternative should have been presented for their consideration and decision * * *."

In the case of *State v. Norton,* 28 S. C., 572, 6 S. E., 820, in which the defendants were charged with murder, Mr. Chief Justice Simpson, speaking for a unanimous Court,

said in his opinion at page 579 of the State reports, 6 S. E., at page 823:

"We think, also, it was error for his honor, at the conclusion of his charge, after having gone over the whole case, defining the different degrees of homicide, to say, as he did: 'I do not see any room here for a verdict of manslaughter.' * * * We desire to be understood that we rule it was error in the fact that such a charge was made; thereby excluding the question of manslaughter from the consideration of the jury in this case.

" * * * we do not mean to say that, in our opinion manslaughter was made out in this case * * *; but we only mean to say that the responsibility was upon the jury to determine the degree of guilt which attached to these parties; and, to enable them to solve this vital question, the whole case should have gone to them untrammeled by the opinion of the judge."

In that case the trial Judge made the statement that he saw no room for a verdict of manslaughter. In the case at bar, would not the conspicuous absence of a charge as to the law of manslaughter be tantamount to the same thing?

In the case of *State v. Perry*, 78 S. C., 184, on page 186, 59 S. E., 851, on page 852, Mr. Justice Gary, speaking for this Court, cited with approval, the language of the Court in the case of *State v. Turner*, 29 S. C., 34, 43, 6 S. E., 891, 13 Am. St. Rep., 706, as follows: "The degree of a homicide in any special case depends upon the motive which prompted the killing, and this is a matter entirely for the jury. The judge should define and explain these different degrees, and the jury must be governed by the definition and explanations given. But whether any particular crime as defined by the judge has been committed, * * * is a question of fact, and is alone for the jury."

It will be observed from the language just above quoted that "the degree of a homicide in any special case depends upon the motive which prompted the killing." In the instant

case, as we have seen, the motive, if any, appears not to have been shown. This aspect of the case at bar distinguishes it from the situation which existed in the case of *State v. Edwards,* 194 S. C., 410, 10 S. E. (2d), 587, wherein we find on page 416 of the State reports, 10 S. E. (2d), at page 589 that: "The theory upon which the State prosecuted this appellant for murder was that appellant *deliberately planned* the unlawful killing of the deceased". (Emphasis added.) No theory of such deliberate plan appears in the testimony in the instant case. Furthermore, the present case is further distinguished from that of *State v. Edwards, supra,* in that in the latter case it appears that there was no evidence whatsoever tending to reduce the crime from murder to manslaughter.

Likewise, the instant case is distinguished from that of *State v. Weldon,* 89 S. C., 308, 71 S. E., 828, wherein the crime of murder had been established, and the sole issue there before the jury was whether the defendants were participants in the assassination.

In the recent case of *State v. Brice,* 190 S. C., 208, 2 S. E. (2d), 391, 392, the appellant was tried upon a charge of assault and battery with intent to kill and murder. The testimony was in sharp conflict, but the testimony of the appellant, largely corroborated by her husband, was clearly an effort to establish a plea of self-defense. The opinion of this Court in that case was stated in the following language:

"The charge of the trial Judge, though full and clear to the charge laid in the indictment, made no reference to the law of self-defense.

"As was held in *State v. DuRant,* 87 S. C., 532, 70 S. E., 306, 307, 'The requirement of the Constitution that the judge shall declare the law * * * means that he *shall* explain so much of the criminal law as is applicable to the issues made by the evidence adduced on the trial.'

"In *State v. Faulkner,* 151 S. C., 379, 149 S. E., 108, Justice Stabler said: 'The "right *to eject*" is a *distinct* de-

fense, and, if a charge as to the law governing this right was *applicable* to the case, the defendant was *entitled* to such charge, *whether he requested it or not.'*

"See, also, *Norris v. Clinkscales,* 47 S. C., 488, 25 S. E., 797; *Collins-Plass* [*Thayer Co.*] *v. Hewlett,* 109 S. C., 245, 95 S. E., 510; *Powers v. Rawls,* 119 S. C., 134, 112 S. E., 78.

"Hence, the testimony on the part of the appellant having clearly and definitely introduced into the trial the issue of self-defense, and that defense being a 'distinct' defense, it became the duty of the trial Judge to charge the law *applicable* to this defense, whether requested or not.

"The exception challenging the correctness of the charge of the trial Judge in this particular must be sustained."

Under the authority of the foregoing case, and of other cases pertinent to the exception which we are now considering, we do not think that the defendant lost or waived his right to have the jury charged as to the law of manslaughter merely by the fact that his counsel placed the matter squarely before the trial Judge and left the decision with the Court as to how the question of manslaughter should be handled. We have seen that such a charge, if proper, should be made irrespective of whether it is requested. We are of the opinion that such a charge was proper and necessary under the testimony in this case, and the seventh exception of the appellant is therefore sustained.

The eighth exception, which we shall next consider, is: "That his Honor erred in failing to charge the jury the law relative to alibi; the error being that there was testimony tending to show defendant was not present when the homicide occurred."

The State, in presenting its case, had placed considerable emphasis upon its contention that at the filling station, on the Sunday morning under consideration, the defendant had worn a certain pair of boots, overalls and shirt, all of which were found, bearing blood stains, near the defendant's resi-

dence shortly after the death of his wife. The bloodstained clothing was exhibited during the course of the trial and was placed in evidence.

Mr. D. M. Hanna, a witness for the defendant, testified that he went to the filling station at about eight o'clock on that morning, that the defendant was at the filling station when he arrived, and was still there when the witness left about two hours later, and that the defendant was then wearing trousers, slippers, and a shirt which did not resemble the one which later was found bearing blood stains.

Mr. Dallas Bellflowers testified on behalf of the defendant that he was at the filling station on that Sunday morning when the defendant came there at about the usual time of his arrival on Sunday mornings, wearing slippers, green trousers, and a faded shirt with a white streak in it; that the witness saw the defendant a large part of that morning, as well as shortly after noon of the same day, after Elizabeth Bealin's death, at which time the defendant was wearing the same shirt and trousers which he had worn earlier during that day.

The defendant, in his testimony, corroborated that of Messrs. Hanna and Bellflowers as to the manner of his dress on that morning, and testified that he left the filling station between 11:30 that morning and noon and went immediately to his home in order to take his wife to church at around twelve o'clock, and that he found her dead upon his arrival.

Examining the testimony further for the purpose of ascertaining whether there was testimony tending to show the absence of the defendant at the time of his wife's death, we find that Esther Allison, an aunt of the defendant, testified that Monroe Bealin had money which was kept at his home; that his wife had shown her a little box which was kept in a trunk, and had told the witness of its contents.

Mr. R. C. Coward, who at the time under consideration was a merchant in that vicinity, testified that at his store he had seen the defendant when paying bills have $50.00 or

$100.00 at a time, and that this occurrence was not confined to any particular time of the year, such as harvest season; that Monroe Bealin was considered to be a good farmer who made, saved, and did not throw away his money; that it was generally known or understood in that community that the defendant had money, that the witness had heard mention of it around his store, and that for the past several years it had been talked among the colored people generally that the defendant had money in his home.

Therefore it seems to us that this testimony revealed a possible motive for an outside marauder to take the life of Elizabeth Bealin in the course of robbery while she was alone in the house with her two very young children, and, coupled with the lack of motive shown as to the defendant, that the trial Judge should have so evaluated this testimony as a supporting reason for charging the law of alibi, and indirectly, for charging the law of manslaughter, since, if the jury nevertheless should find the evidence sufficient to convince them that the defendant had killed his wife (regardless of the fact that there was no demonstrated motive for such an act) then the jury, under the evidence, could have inferred that such killing was done spontaneously in sudden heat and passion, particularly in view of the failure of the State to offer testimony as to any existing or previous difficulty between the defendant and the decedent, and the jury could thus (under a proper charge, have considered the lack of motive from the lack of proof thereof).

An excellent discussion of the nature of the defense ■ of alibi, as it is now regarded in this jurisdiction, is found in the case of *State v. Deschamps,* 134 S. C., 179, 131 S. E., 420, from which we quote the following clear exposition of the law as expressed in the concurring opinion of Mr. Justice Cothran; beginning at page 181 of the State reports, at page 420 of 131 S. E.:

"I think that there is a very great difference between what are denominated the 'affirmative defenses' of insanity and

alibi. Unquestionably, as the law presumes the sanity of a defendant who is shown by the evidence and admitted by him to have committed a ·crime, the burden is cast upon him to prove by the preponderance of the evidence the special plea of insanity, which he is required to interpose upon his arraignment subject to the companion rule that if upon the whole case the jury should entertain a reasonable doubt of his legal guilt, they must acquit.

"But it seems to me that the so-called 'affirmative defense' of alibi is not an affirmative defense at all. It is simply evidence adduced by the defendant to sustain his plea of not guilty; that he did not commit the crime for the reason that he was not at the scene of the crime at the time of the occurrence. The burden was upon the state to prove beyond a reasonable doubt that the defendant was present at the scene of the crime and actually committed it. If the defendant offers evidence which generates a reasonable doubt in the minds of the jury that he was at the scene of the crime when it was committed, which of course would result from evenly balanced evidence upon this point, he should be acquitted.

"In 16 C. J., 533, it is said:

" 'Nor is the burden resting on the state shifted by insisting erroneously that the accused is interposing the defense of alibi, and although defendant, where the case is otherwise made out against him, is bound to offer some evidence in support of his alibi, the state in all cases where his presence at the time and place of the crime is necessary to render him responsible, must prove that he was there, as a part of the case; and if from all the evidence there exists a reasonable doubt of his presence, he should be acquitted.'

"In *State v. Grice,* 106 S. C., 279, 91 S. E., 383, the Court said:

" 'The alibi was merely a means of disproving the charge' —not an affirmative defense, but a negation of the State's case.

"In *State v. McDaniel,* 68 S. C., 304, 47 S. E., 384, 102 Am. St. Rep., 661, it was held error to charge that the defense of accidental killing had to be established by the preponderance of the evidence. I cannot see that the defense that the defendant was elsewhere when the crime was committed is any more an affirmative defense than that the admitted killing was accidental. I really think that it was less so.

"I think that there is a very great doubt as to the contention of the state that the presiding judge in his general charge was sufficiently explicit as to the duty of the state in establishing the guilt of the defendant beyond a reasonable doubt, as applied to the 'affirmative defense' of alibi. He did not specifically apply that principle when he went to charge upon alibi, and the jury may well have considered that he did not mean for it to apply in such a case. His charge conveyed the idea that, regardless of the rule he had correctly stated, when the defendant set up an affirmative defense and failed to establish it by the preponderance of the evidence (which, of course, would result from the even balancing of the evidence upon this point), they should repudiate his affirmative defense and convict him."

In the case of *State v. McGhee et al.,* 137. S. C., 256, 135 S. E., 59, this Court held that the opinion of Mr. Justice Cothran in the *Deschamps case, supra,* correctly sets forth the law that the defense of alibi is not an affirmative defense, and adopted that opinion in the case in which it was then concerned. In that case this Court also said; at page 260 of the State reports, at page 60 of 135 S. E.:

"The rule heretofore announced respecting the defense of alibi has been in substance as follows: The state must prove beyond a reasonable doubt that the defendant is guilty, and, if involved in a crime where his actual presence is a necessary element, must prove that said defendant was at the place, and at the time, alleged in the indictment.

"As stated above, the state must show the presence of the defendant beyond a reasonable doubt, and if on all the evidence in the case the jury has a reasonable doubt that the defendant was at the place, and at the time, alleged in the indictment, in person, then the jury must solve this doubt in favor of the defendant and must acquit.

"It appears to the court that this is the logical statement of the rule on the subject. The further statement found in the cases heretofore, that alibi is an affirmative defense and must be proven by the party on trial by the greater weight of the evidence, is illogical, lays down a rule, in part at least, inconsistent with the rule above stated, and is calculated to confuse the jury. * * * There can be no rational adjustment of these two statements so that they may be made to work in harmony."

In the fairly recent case of *State v. Floyd,* 174 S. C., 288, 177 S. E., 375, Mr. Justice Blease,. later Chief Justice, in delivering the opinion of the Court, in discussing the legal propositions involved, said, at page 293 of the State reports, at page 377 of 177 S. E.: " * * * One of those, referred to in the fourth exception, that the state has the burden of disproving the defense of alibi, is, perhaps, a little inaptly stated in the exception, but it is in practical accord with the present rule, adhered to in this state, as to the effect of that defense. This court, in the case of *State v. McGhee,* [*supra*] for the first time expressly declared that an alibi was not an affirmative defense, as it had been theretofore long held. * * * and since the decision in the *McGhee case,* the holding there has been followed." (Citing with approval the opinion of Mr. Justice Cothran in the *Deschamps case, supra.*)

In a discussion of the law pertaining to alibi, under the heading "Criminal Law" in 22 C. J. S., page 887, § 574, it is stated that: "Pursuant to the general rule, * * * in all cases where the presence of accused at the place of the crime, at the time of its commission, is essential to his guilt,

the state has the burden of proving such presence beyond a reasonable doubt, and failure so to prove warrants acquittal. This rule prevails where accused merely controverts the prosecutions' evidence; * * *." (Citing authorities.)

Although in the present case there appears to be no contention or view that the defense of alibi is an affirmative defense, the matter becomes important here because the rule which previously prevailed in this State is still the law in some other jurisdictions, and would therefore naturally tend to have a bearing on the holding in those states upon the issue raised in the exception now under consideration, as we shall see when we come to consider the fact that no request to charge was made in the present case.

Before considering the question of the absence of a request to charge, we wish to cite briefly the propriety of an instruction upon the law of alibi as has been held in some other jurisdictions. In its discussion of Criminal Law, we find on page 758 of 23 C. J. S., § 1203, the following statement supported by a number of authorities cited therein: "An instruction as to the defense of alibi is properly given where such defense is presented and supported by evidence, * * *." And in the North Carolina case of *State v. Byers*, 80 N. C., 426, it was held that where the defendant's evidence tends to prove an alibi, a judgment of conviction must be reversed for failure to instruct thereon.

Cited in footnote 50 to §1203 on page 758 of 23 C. J. S., is the case of *Higgins v. State*, 45 Ga. App., 223, 164 S. E., 108, in which it was held that where the accused introduced no evidence, a charge on the subject of alibi could properly be made on the basis of the accused's statement; and also the case of *Taylor v. State*, 155 Ga., 785, 118 S. E., 675, wherein it was held that when the accused claimed that he was not the perpetrator of the homicide and was not present when it was committed, if any crime was committed, it was not error to charge on the theory of alibi, although not expressly

set up as a defense, and only incidentally involved under the accused's statement.

In 8 R. C. L., in its discussion of Criminal Law, on page 224, Section 220, it is stated with reference to the question of alibi that: "* * * It is enough if the proof adduced in support of it, viewed in connection with all the testimony in the case, creates such a probability of its own truth as to engender a reasonable doubt of the truth of the charge upon which the defendant is arraigned; and this might be effected even though the jury did not feel positively assured either of the veracity of the witness or of the correspondence of time. If, looking to all the evidence, inculpatory and exculpatory, they entertain a reasonable doubt of the prisoner's presence at and participation in the crime, they should acquit."

The foregoing exposition of the law is supported by numerous decisions cited in footnote 12 thereunder, and we think the principle is sound. This being true, should not the jury have received an instruction as to the law under which they were to consider the defense of alibi?

In the South Carolina case of *State v. Brice, supra,* it does not appear that the defendant relied on any particular plea other than that of not guilty. Upon appeal, this Court construed her testimony to constitute an effort on her part to establish a plea of self-defense, and treated it accordingly. In the present case, therefore, we think that the question of abili was properly before the trial Court under the testimony that the defendant was not present when the decedent met her death, and that this issue should have been so regarded by the trial Judge, even though the defendant went through no particular form or routine of establishing a more formal alibi. Regardless of its form, the plea of alibi in this case was a main defense, and, because the evidence of the State was largely circumstantial, the defendant (who was on trial for his life) was all the more entitled to the benefit

of a charge pertaining to this plea than he might have been if the evidence for the State had been more direct.

With reference to the absence of a request for such a charge, we find in Annotation "b" on page 1309 of 118 A. L. R., a citation of authorities sustaining the proposition that where an issue as to alibi has been raised, it is the duty of the Court to instruct the jury upon the subject, notwithstanding such instructions have not been requested.

We realize that in some jurisdictions it is the rule that there is no duty upon the trial Court to instruct specifically upon the subject of alibi in the absence of a requested instruction, but in those jurisdictions, in some instances, as appears from the Annotation on Alibi on page 1305 of 118 A. L. R.: "The Court, in several of the above cases, gave as its reason for holding that there was no duty upon the trial Court to instruct as to alibi in the absence of a request, that *alibi was a part of the defendant's affirmative defense,* and it was his duty to ask for the instruction if he desired it." (Emphasis added.)

In such jurisdictions it appears to be the rule that if the defendant had desired such a charge he should have requested it, in connection with establishing his *affirmative defense* of *alibi,* but as we have already seen, the proposition that alibi is an affirmative defense has been abrogated in this State, and decisions based upon that doctrine can no longer be regarded as authority here.

In the case of *Com. v. Jordan,* 1938, 328 Pa., 439, 196 A., 10, 13, cited on page 1309 of 118 A. L. R., the Court in that case said: "It is equally well settled that, where an alibi defense is presented, a failure, even in the absence of a specific request, to instruct the jury as to the degree of persuasion required is reversible error, for the reason that the jury is not furnished with a standard for determining the legal value of the evidence. 'The defendant had a right, even though no request was made for the instruction, to have the jury fully advised as to the difference between the burden

resting upon the commonwealth to establish guilt, and that resting on the defendant with respect to the alibi set up.' *Com. v. Andrews.* * * * 234 Pa., 597, at page 604, 83 A., 412, 414."

See, also, *State v. Melton,* 187 N. C., 481, 122 S. E., 17, in which the defendant was held to be entitled to an instruction upon alibi, without requesting it, under the statutes of North Carolina wherein it was provided that the Judge in a case should state in a plain and correct manner the evidence given and declare and explain the law arising thereon, it being there held that the defendant's evidence in respect to alibi was substantive, vital, and perhaps the chief defense on which he relied.

In some jurisdictions, cited in the annotation last above referred to, it is held that the duty of the trial Judge to instruct upon the question of alibi, in the absence of a request therefor, is imposed in cases where special circumstances exist, as for example, in the present case, where the evidence on which the guilt of the defendant was predicated, was mainly circumstantial. That annotation cites also the case of *Sapp v. State,* Tex. Cr. App., 1903, 77 S. W., 456, in which the trial Court was held in duty bound to instruct as to alibi, where the evidence relied upon by the State was purely circumstantial, even though the accused apparently did not specifically set up this defense. Several cases are also cited in that annotation supporting the view that such a charge should be given, even in the absence of a request therefor, where alibi is the main defense.

In the case of *State v. McNinch,* 12 S. C., 89, at page 96, this Court said: "This Court is bound, in a capital case, to take notice, in behalf of the accused, of any error apparent upon the record by which the prisoner has been deprived of any of the substantial means of enjoying a fair and impartial trial."

For all of the foregoing reasons, based on the authorities which we have cited in connection with the law of alibi, as well as upon some of the authorities cited under our discussion of the question of manslaughter (such authorities being equally applicable to both questions), we are of the opinion that the trial Judge should have instructed the jury as to the law of alibi, and hence the eighth exception of the appellant is sustained.

The first exception, which we shall now consider, is: "That his Honor erred in permitting the witness, F. E. Poston to testify what the officer did pursuant to an alleged conversation with a child three years of age, the error being that his Honor should have excluded such testimony on the grounds that any claimed conversation with a child of such tender years was incompetent and consequently anything done as a result of such conversation was incompetent and allowing such testimony was prejudicial to the defendant."

At folio 11 of the Transcript of Record, we find the following in the direct examination of F. E. Poston:

"Solicitor Long: After Mr. Cockfield got there, did the child make a statement? Don't tell what it was.

"Witness: She did.

"Q. After the child made the statement, what did Mr. Cockfield do?

"Mr. McDonald: If the Court pleases, at this time I want to interpose this objection; I want to object to that testimony because any statement—I don't know what it was, haven't the slightest idea—but any statement made by a two or three year old child certainly, under the law, would be incompetent.

"The Court: Well, I sustained that; nothing that was said would be competent but the fact that the child was there or not there, I wouldn't rule that out. I mean, I am not commenting on the testimony but as to whom was there would be competent; or who wasn't there would be competent; what occurred after the witness got there.

"Q. What did Mr. Cockfield then do? A. He went towards the way the child pointed.

"Q. Wait a minute. I didn't ask you the conversation; what did Mr. Cockfield do, which direction did he go?

"The Court: Not what somebody told you. Where did he go? Did he go inside the house?

"Witness: No, sir, he went in the woods to look for the clothes and gun."

We find no error in the rulings of the Court which we have just quoted. It is unnecessary to cite authorities for the fact that a witness may testify that he did a certain thing because of information which he had received, provided that in doing so he makes no improper statement of the contents of the conversation or other communication which was the source of his information. By stating that his actions were done as a result of information he had received a witness thereby frequently explains and rationalizes his own conduct, thus clarifying to the jury the position of the witness in relation to the matter under consideration.

We think that the trial Judge was correct in sustaining the objections which counsel for the defendant made at that time and also later in the trial when the same matter was again alluded to. Likewise we see no error in anything which the Court said upon the subject, insofar as the Court made any rulings. Where a witness is competent to testify as to what he did as a result of his information, it is not necessary that the source of his information be such a person as could qualify as a witness in the case, provided that that source of information is not permitted, indirectly, to testify through the witness. The fact that the source of Mr. Poston's information was a child too young to testify is immaterial. Sources of information might conceivably be an animal or an inanimate object.

But in the present case the witness went beyond merely telling the source of the information. In reply to the solicitor's question: "What did Mr. Cockfield then do?" the

witness stated: "He went towards the way the child pointed." We think that this, in effect, was permitting the three-year-old child to testify. Any statement made by this child, as his Honor had already ruled, would be incompetent. This, certainly, applies to any form of statement, whether it be oral or by gestures or by diagram. It is the communication of the idea which is forbidden, whether such communication be in writing or by any other means.

The record shows, however, that although counsel for the defendant had made previous objections to allowing testimony from this child to insinuate itself (without doubt inadvertently) into the record, and that later in the course of the trial he made similar objections, yet he did not interpose an objection to the above-quoted answer, whereupon that fragment of testimony went to the jury unchallenged. The testimony of this three-year-old child which was thus referentially brought before the jury, though brief, concerned a vital link in the case, and could, and perhaps did, have weight with the jury in its conclusion as to the defendant's part in the matter.

Under the circumstances, therefore, we are of the opinion that the Court, upon its own motion, should have directed that the answer be stricken from the record, and should have instructed the jury to disregard it, irrespective of the fact that although defendant's counsel had been sustained by the Court in earlier motions of a similar nature, no such motion was made in this particular instance.

In the case of *State v. Floyd, supra,* it was said by this Court on page 295 of the State reports [177 S. E., on page 378] : "In the consideration of the appeal, we disregard all technical rules, recalling what was said for this court by the late distinguished Chief Justice Watts in the *State v. Bigham,* 133 S. C., 491, 131 S. E., 603, 609, which was approved in the later case of *State v. Hester,* 137 S. C., 145, 134 S. E., 885, as follows: 'It is not an open question any longer that in a capital case this court will take notice of any

error apparent on the record affecting the substantial rights of the accused, even though not made a ground of appeal.' "

Our earlier similar quotation from the case of *State v. McNinch, supra,* which we made in our discussion of the question of alibi, is also applicable here.

Brief though the unwarranted answer of the witness was, it is impossible to calculate what incriminating inferences the jury may have drawn from it in regard to the guilt of the defendant, and while standing alone, and in the absence of other errors, the failure to strike the answer from the record and to instruct the jury accordingly might not be sufficient grounds to warrant a reversal, nevertheless we think the Court was in error in allowing the jury to consider the child's communications, regardless of the manner of their expression, and although expressed by signs rather than in words, and, in view of the seriousness of the offense with which the defendant is charged, and in view of the disposition which we are making of other questions involved in the case, so much of the first exception as pertains to the above-quoted answer of Mr. Poston is sustained.

The fifth exception of the defendant is: "That the Court erred in that the cross examination of defendant by the Solicitor was prejudicial in that the Solicitor ridiculed the defendant and specifically stated in several questions propounded to defendant that he, defendant, had killed his wife, thereby expressing to the jury the Solicitor's opinion that defendant had killed his wife."

The following portion of the cross examination of the defendant by the Solicitor is copied from the Transcript of Record:

"Q. What had your wife done to cause you to kill her? A. I didn't kill her.

"Q. Did you have any reason for taking that woman's life, that you said you loved? A. I didn't kill her.

"Q. She was shot down there in her own house and died in her own blood. A. I didn't shoot her.

"Q. I say, she was shot there in her own house. A. I don't know, sir, I didn't see it.

"Q. And the blood you say came from her was on your shirt? A. I don't know, sir.

\* \* \*

"Q. I want to ask you again: Can you give the jury any reason why you shot your wife and killed her? A. I didn't do it.

"Q. Did you kill her in self defense? A. I didn't do it.

"Q. Did your wife do anything to cause you to kill her? A. I didn't do it.

"Q. Was there any reason why you wanted to kill her? A. I didn't kill her.

"Q. Did she threaten you? A. I didn't kill her.

"Q. Did your wife threaten you? A. I didn't kill her.

"Q. I didn't ask you that. On this Sunday morning did your wife threaten to kill you? A. No, sir.

"Q. Did she draw any shot gun? A. No, sir.  \* \* \*

"Q. Just answer my question. I want to ask you if that Sunday morning your wife drew any shot gun on you? Just answer yes or no. A. No, sir.

"Q. Did she draw any stick on you? A. She didn't on me.

"Q. Were you afraid of her? A. No, sir.

"Q. Did she offer to hurt you? A. No, sir.

"Q. Was there any reason for you taking her life there that morning? A. I didn't do it.

"Q. Is she living or dead? A. She is dead, I reckon."

In its discussion of Criminal Law, we find the foling statement in 23 C. J. S., 519, § 1081, subsection 3, with reference to the conduct of the prosecuting attorney: " \* \* \* he should bear in mind that he is an officer of the court, who represents all the people, including accused, and occupies, a *quasi*-judicial position, whose sanctions and traditions he should preserve. It is his duty to see that justice is done. He must see that no conviction takes place except in strict conformity with the law,

and that accused is not deprived of any constitutional rights or privileges. However strong the prosecuting attorney's belief may be of the prisoner's guilt, it is his duty to conduct the trial in such a manner as will be fair and impartial to the rights of accused, * * * and not say or do anything which might improperly affect or influence the jury or accused's counsel. He should not abuse or make any unseemly demonstration toward accused; abuse or make baseless insinuations against his witnesses; make remarks or insinuations calculated to impress the jury against accused; * * *." (Citing authorities.)

See also the further discussion along similar lines contained in §§ 1116 and 1117, pages 600-616 of the same volume.

In the case of *State v. Kennedy,* 143 S. C., 318, 141 S. E., 559, this Court said at page 323 of the State reports, at page 560 of 141 S. E.: " * * * uncalled for personal abuse of a witness by counsel is objectionable and will not be condoned or allowed by the court."

And in the case of *Edwards v. Union Buffalo Mills Co. et al.,* 162 S. C., 17, 159 S. E., 818, the foregoing language from the *Kennedy case, supra,* was further approved. See, also, the case of *State v. King,* 158 S. C., 251, at page 285, 155 S. E., 409, at page 421, in which this Court, speaking through Mr. Justice Blease, said, after quoting the foregoing language from the case of *State v. Kennedy, supra:* " *, * * If the record in any case shows that this salutary rule has been violated, and the effect was, in this court's opinion, to prevent one charged with crime from having the fair and impartial trial, guaranteed to him under the Constitution of this state, this court will exercise its power to uphold the Constitution by reversing the case, with the purpose of giving a defendant the trial to which he is entitled."

In the case of *State v. Parris,* 163 S. C., 295, at page 300, 161 S. E., 496, at page 498, this Court said: " * * *

the solicitor is not only a representative of the state, but he speaks in many ways for the defendants brought into court. The solicitor is a *quasi*-judicial officer, and this court has repeatedly held that a solicitor must not, because of the high position he holds, say things, or do things, which would have any effect to prevent a citizen, however humble, from obtaining the fair and impartial trial he is entitled to under the law."

In the North Carolina case of *Massey v. Alston,* 173 N. C., 215, 91 S. E., 964, it was held that a party or witness should not be subjected unjustly to abuse calculated to degrade him or to bring him into ridicule or contempt. See, also, the case of *Rivers v. Industrial Life & Health Insurance Co. et al.,* 173 S. C., 45, 174 S. E., 595.

We are fully aware that the solicitor had no intention of depriving the defendant of any of his rights, or of exceeding the bounds of his duty. It is entirely apparent that the solicitor had no plan of injuring the defendant by digressing into the forbidden realm of holding the defendant up to ridicule. But unintentionally the solicitor, in the zeal of performing his duty and in the excitement of the trial carried his cross examination of the defendant to an extreme which resulted, in our opinion, in working an injury to the defendant. The defendant had repeatedly denied his guilt, and the repeated expression of the opinion of the solicitor that the defendant was guilty, which opinion was expressed in his variously worded questions to the same effect, after the defendant's denial, could serve only to prejudice the defendant in the minds of the jurors. While we are not prepared to say that the conduct of the solicitor in this regard, if standing alone, transcended the rules of proper cross examination sufficiently to warrant a reversal, we do say that it was harmful to the defendant's right to a fair trial, and we have considered it accordingly in connection with the other reasons upon which we base our opinion in this case.

Without passing directly upon the other questions involved in the case (Exceptions 2, 3, 4, 6 and 9) we think the judgment of the Circuit Court should be reversed, for the reasons we have given.

Judgment reversed, and the case is remanded to the Circuit Court for a new trial.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE and STUKES, and CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE, concur in part and dissent in part.

MR. ASSOCIATE JUSTICE FISHBURNE (dissenting in part).

I concur only in so much of the opinion of the Chief Justice as holds that the case should be remanded for a new trial upon the ground that the lower Court erred in failing to charge the law with reference to alibi.

I am unable to agree that there is any evidence in the record which made it incumbent upon the trial Judge to give any instruction to the jury on the law of manslaughter. The testimony given by the defendant himself is positive and specific to the point that on ithe morning of the homicide, his wife, the deceased, had offered him no violence or provocation whatsoever. He pleaded not guilty, and maintained throughout the trial that he was not at home when the murder was committed. My examination of the record does not disclose any theory upon which the law of manslaughter could properly have been charged.

It appears to be well settled in this jurisdiction that where there is no evidence to sustain a verdict of guilty of a lesser offense than that charged in the bill of indictment, it is not incumbent upon the Court to submit to the jury the question of defendant's guilt of lesser degrees of the crime charged. This rule applies to indictments for murder where the testimony fails to suggest any theory upon which a verdict of manslaughter could rest.

We have held in the recent case of *State v. Edwards,* 194 S. C., 410, 10 S. E. (2d), 587, 590, that where "there is no

evidence whatsoever tending to reduce the crime from murder to manslaughter, then it is not only unnecessary for the trial Judge to charge the jury the law as to manslaughter, but it is improper to do so."

Where a careful examination of the testimony fails to suggest any theory upon which a verdict of manslaughter could rest, a new trial should not be granted for failure to charge upon a phase of the law to which the testimony could not in any reasonable view be made to apply. *State v. Adams,* 68 S. C., 421, 47 S. E., 676.

Upholding the same doctrine are the cases of *State v. Weldon,* 89 S. C., 308, 71 S. E., 828; *State v. DuRant,* 87 S. C., 532, 70 S. E., 306; *State v. Jones,* 133 S. C., 167, 136 S. E., 747.

Nor am I able to agree with the disposition made of the first exception, which assigns error to the Court in permitting the witness, F. E. Poston, to testify what Mr. Cockfield, who was an officer, did, following the conversation which he had with a child three years of age. No effort was made by the witness to repeat any statement made by the child. In reply to the solicitor's question: "What did Mr. Cockfield then do?", the witness stated: "He went toward the way the child pointed." I am unable to conclude that by permitting this question and this answer in evidence, it, in effect, allowed a three-year-old child to testify, or that this answer should have been stricken from the record on the Court's own motion. It seems to me that the evidence was competent and admissible.

I must also dissent from the disposition made of the fifth exception, which complains of the manner and mode of cross examination of the defendant by the solicitor. While the cross examination conducted by the solicitor was vigorous, it does not seem to me that it transcended or violated any rule governing a proper cross examination in a criminal case.

In my view, the case should be remanded for a new trial only upon the ground of error on the part of the lower Court in failing to instruct the jury on the law of alibi.

CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE, concurs.

MR. ASSOCIATE JUSTICE BAKER (concurring in part):

I concur in so much of the opinion of the Chief Justice as holds that the lower Court erred in failing to charge the law with reference to alibi; and also in the holding with reference to Exception 5.

I concur in that portion of the opinion of Mr. Justice Fishburne, which holds that "The record does not disclose any theory upon which the law of manslaughter could properly have been charged"; and in the result of the disposition of Exception 1. If the appellant had moved to strike out the statement of the witness, F. E. Poston, "He went toward the way the child pointed," it would have been error not to do so. However, appellant did not move to strike out the statement quoted, and I am not disposed to hold that it was the duty of the trial Judge to be more alert than counsel for appellant.

It is probably not amiss to call attention to the fact that the surname of appellant has been incorrectly spelled in the record. It should be spelled "Belin."

MR. ASSOCIATE JUSTICE STUKES concurs.