15769

## THE STATE v. WARREN

(35 S. E. (2d), 38

*Messrs. H. Klugh Purdy,* of Ridgeland, S. C., and *George Warren,* of Hampton, S. C., Counsel for Appellant,

*Mr. Randolph Murdaugh,* Solicitor, of Hampton, S. C., Counsel for The State,

August 20, 1945.

Mr. Associate Justice Oxner delivered the Opinion of the Court.

Appellant, H. D. Warren, was tried on an indictment charging him with the murder of one George C. McIlroy and found guilty of manslaughter. A sentence of five years was imposed.

The facts leading up to the homicide may be briefly summarized as follows: On May 14, 1944, McIlroy, two other men, and five women were returning North from a stay at Melbourne, Florida. The women were making the trip in an automobile which was followed at some distance by the three men in two trucks. The women had car trouble and for the purpose of having the car repaired, stopped about ten o'clock that night at a service station operated by appellant on Highway 17, near Hardeeville, South Carolina. Appellant and his family resided in the same building.

According to appellant's testimony, he undertook to repair the car and about an hour and a half later, before he had completed the job, the two trucks with the three men

stopped at the station. Two of the men, using profanity, commenced immediately to complain of the time which appellant had consumed in fixing the car, stated that he did not know what he was doing, and requested that the car be turned over to them. A fight ensued in which appellant says he was assaulted by all three men. During this struggle appellant received a scalp laceration in the back of his head and one of the other men some scratches on his face. Appellant's wife testified that during the struuggle her husband called "for help"; that she then went into the house and secured a pistol; and came back to the door of the filling station, at which time her husband took the pistol from her hand and started shooting. On cross examination, appellant gave the following explanation of his action at this point:

"A. I got up, I got the gun when my wife came out there to snatch it out of her hand to my hand.

"Q. What was McIlroy doing? A. I do not know, sir.

"Q. I am asking you. If you do not know, how do you expect us to know it? A. I do not know, sir.

"Q. What was McIlroy doing at that time? A. Nothing.

"Q. Not a thing in God's world? A. (No answer.)

"Q. Was he advancing on you with a gun? A. I do not know, sir.

"Q. Was he advancing on you with a knife? A. No, sir.

"Q. Was he advancing on you with a piece of iron? A. No, sir.

"Q. Was he trying to hurt you? A. Not then, but he had already hurt me.

"Q. How long before you shot him? A. About a minute and a half.

"Q. And at the time you shot him he was not doing a thing to cause you to shoot him? A. Not right at the moment, but he had already hurt me."

Appellant further testified: "I shot him (McIlroy) in the side as he started to step away." Appellant shot twice, the last shot striking McIlroy and proving fatal. Appellant further testified that after shooting McIlroy, he shot twice at another one of the men at a distance of about thirty feet, "who was running away from me," but missed him.

According to the testimony of Mrs. McIlroy, one of the State's witnesses, the ladies were at the service station approximately three hours before the men arrived. She testified that only appellant and one of the men were engaged in this fight; that appellant was the aggressor; that her husband was only undertaking to separate the men; that when appellant secured the pistol, they all fled; and that at the time her husband was shot, he was holding up his hands begging appellant not to shoot him, and pleading that "he had nothing to do with it."

On the day following the homicide, the Solicitor and Sheriff visited appellant in the Jasper County jail. The exceptions relate solely to the direct examination of the Sheriff by the Solicitor and his cross examination of the defendant with reference to statements claimed to have been made by appellant during this interview.

It is contended that the following testimony of the Sheriff on direct examination was highly prejudicial, in that "testimony of the Solicitor was injected into the case without the Solicitor being a sworn witness and without the defendant being confronted with such witness":

"Q. State whether or not you remember you, a cousin of mine, Alex Murdaugh, and I going to the jail and interviewing Mr. Warren? A. Yes, sir.

"Q. Did Mr. Warren make a statement to me in your presence? A. Yes, sir * * *.

"Q. Sheriff, I believe I made a memorandum of it? A. Yes, sir.

"Q. You cannot read it aloud. State whether or not this refreshes your memory of what Mr. Warren told you and I (me) in jail? (Handing statement to the witness.) A. Yes, sir, that is the statement.

"Q. Will you tell us what Mr. Warren told us in jail, Sheriff, while I was questioning him? A. Yes, sir.

"Q. State whether or not, I was trying to be as nice as I could to him? A. Yes, sir.

"Q. Now, go ahead. A. He said he shot McIlroy about twenty-five or twenty-seven feet from him and that McIlroy had no gun.

"Q. Had no what? A. Had no gun, or knife or anything with him.

"Q. Do you remember whether or not he said McIlroy was coming on him? A. He said he was running away from him."

It is further contended that in the following cross examination of appellant, "the Solicitor seriously prejudiced the defendant, by aligning the veracity of the Sheriff with the veracity of the defendant, and by injecting into the case over objection and in violation of the Court's ruling an alleged attack by the defendant upon the veracity of the Sheriff":

"Q. Mr. Warren, do you remember when Sheriff Drew and I went up and talked to you in jail? A. Yes, sir. * * *

"Q. And what you told us and what you remembered about it? A. No, sir, not like you said awhile ago.

"Q. And what you told us like it happened? A. Yes, sir.

"Q. Now, why did you shoot McIlroy and why did you shoot him? A. Why did I shoot him?

"Q. Yes, sir. A. Because I did not want all three of them on us.

"Q. Now, why didn't you tell us that the three men were on you in jail that day? A. I did tell you so.

"Q. And the Sheriff got up and said what he did this morning and you never heard the Sheriff say that? A. I would not expect you to have on that paper what I said.

"Q. I have not got anything on that paper, except what you signed. I never asked you about that. I just asked you about what the Sheriff said on that stand; and did he tell an untruth about it, or not? A. He told part of the truth.

"Q. And he told something was not true? A. I did not say that.

"Q. I am not asking you that. I just simply asked you—

"Mr. Purdy: Your Honor, please, I do not think one witness is called upon to say whether, or not some other witness is telling the truth about it.

"The Court: No, sir, he can tell what he said about it.

"Q. And what the Sheriff said about it, and you didn't say that? A. Well, that note you have in your hand has not been given in front of me here. You have just put it up to me.

"Q. And didn't the Sheriff tell what you told us, or not? A. The Sheriff did not tell before the jury what I said in jail.

"Q. He never told it? A. Not all of it.

"Q. Has the Sheriff got anything against you? A. No, sir, not that I know of,

"Q. Do you feel like the Sheriff is trying to put you in the electric chair? A. I feel that he would not put me in the chair if possible anything he could do.

"Q. And you heard him take an oath? A. Yes, sir.

"Q. You heard what he said when he got on the stand? A. Yes, sir.

"Q. And yet you say it is different? A. What's different?

"Q. What he said and what you say is different?

"Mr. Purdy: I thought your Honor had already ruled that out.

"The Court: He can't say that.

"Mr. Murdaugh: I beg the Court's pardon.

"Q. Did you shoot McIlroy, and you told the Sheriff you shot him when he was twenty-five or twenty-seven feet away from you and you shot him in the back? A. I did not.

"Q. You did not do that? A. No, sir, I did not do that.

"The Court: You ask him if he did not say that.

"Mr. Murdaugh: Did you tell the Sheriff that in the jail. A. No, sir, I did not.

"Q. You heard the Sheriff testify to that. I can't ask you about the note? A. You ought to ask about the note.

"Q. I am not asking you a thing about the note. You heard the Sheriff say that on the stand? A. I heard him say something similar to that. * * *

"Q. How come you did not tell Sheriff Drew, and McIlroy the dead man—the man that you shot, and why didn't you tell him he was one of the three men that jumped on you? A. I did tell him all three jumped on me.

"Q. And jumped on you and tried to beat you up? A. They never tried.

"Q. And you said all three jumped on you and all beat you up? A. Yes, sir.

"Q. And you told us that in the jail? A. Yes, sir."

Before entering into a discussion of the questions involved, it should be stated that appellant's counsel disclaim any intention to reflect upon the Solicitor by these exceptions. With characteristic candor and fairness, they state there was no intention on the part of the Solicitor to deprive appellant of a fair and impartial trial, but say that such was the effect of the quoted examination and cross examination, although it was not so intended.

It will be observed that there was no objection to the testimony given by the Sheriff on direct examination which is now claimed to be prejudicial. The proper procedure was to make timely objection if the testimony was considered incompetent. *State v. Hedgepath,*

107 S. C., 433, 93 S. E., 133. As stated by Mr. Justice Baker (now Chief Justice) in a concurring opinion in *State v. Bealin,* 201 S. C., 490, 23 S. E. (2d), 746, we do not think it was the duty of the trial Judge "to be more alert than counsel for appellant."

With reference to the cross examination of appellant, ██ it is clear that many of the questions were objectionable in form and that certain parts of this testimony were improper. The Solicitor should not have made the statement "I have not got anything on that paper, except what you signed," although he may have been induced to do so by the preceding remark of appellant. No motion was made, however, to strike the statement from the record. Also, it was improper to ask appellant whether the Sheriff in his previous testimony had "told the truth." When objection was made to this method of cross examination, it was promptly sustained by the trial Judge. The line of examination was pursued by the Solicitor; counsel again objected; the Solicitor realized his error and stated, "I beg the Court's pardon." If appellant's counsel felt aggrieved, or that the rulings of the Court were inadequate to protect the rights of the defendant, then a motion for a mistrial should have been made. *State v. Anderson,* 181 S. C., 527, 188 S. E., 186.

Counsel earnestly argue that the principles involved ██ go much further than the mere admissibility of testimony and affect the fundamental right of the accused to a fair and impartial trial. Our attention is called to the fact that the solicitor occupies a *quasi* judicial position, whose traditions he should uphold and preserve, and that it is his duty to conduct the trial in such a manner as will be fair and impartial to the accused. The soundness of this salutary rule is not questioned, but we think that any transgression of the rule by the prosecuting attorney should be called to the attention of the trial Judge and the question should not be raised for the first time in this Court not

only was there no motion for a mistrial or other attempt to have the error corrected during the trial, but the matter was not brought to the attention of the Court by a motion for a new trial. The record discloses that when the verdict of the jury was published, the only action on the part of counsel for appellant was to ask leniency from the Court in the imposition of sentence. Any other view would be contrary to the universally recognized and just principle "that a party cannot take his chances of a successful issue, reserving vices in the trial, of which he has notice, for use in case of disappointment." *State v. Ballew,* 83 S. C., 82, 63 S. E., 688, 690, 64 S. E., 1019, 18 Ann. Cas., 569; *State v. Simon,* 126 S. C., 437, 120 S. E., 230.

We may further add that it is questionable whether the statement claimed to have been made by appellant to the sheriff, to the effect that appellant shot the deceased while the latter was running away from him, could reasonably have affected the result of the trial. The jury having eliminated the charge of murder, this testimony would only tend to show that appellant fired the fatal shot when he was not in imminent peril or danger of losing his own life or sustaining some serious bodily harm, but it is doubtful whether any other rational conclusion can be reached from appellant's own testimony.

All exceptions are overruled and the judgment below affirmed.

Messrs. Associate Justices Fishburne, Stukes and Taylor concur.

Mr. Chief Justice Baker concurs in result.